**PURITY PRODUCTS, INC., Plaintiff,**

v.

**TROPICANA PRODUCTS, INC., et al., Defendants.**

Civ. No. H–86–2319.

United States District Court,
D. Maryland.

Dec. 13, 1988.

Lewis A. Noonberg and Eric Miller, Piper & Marbury, and Jeffrey C. Hines, Baltimore, Md., for plaintiff.

David S. Acker and R. Mark McCareins, Winston & Strawn, Chicago, Ill., and Thomas M. Wilson, III and Fred A. Cohen, Tydings & Rosenberg, Baltimore, Md., for defendants.

ALEXANDER HARVEY, II, Chief Judge.

This civil action was instituted when defendants discontinued sales of orange juice products to a distributor located in Baltimore County. Plaintiff, Purity Products, Inc. (hereinafter "Purity"), is here seeking injunctive relief and damages from various defendants for alleged violations of federal and state laws arising out of defendants' refusal to deal with plaintiff as a distributor of Tropicana brand products. Named as defendants in the complaint are Kohlberg, Kravis, Roberts & Co. (hereinafter "KKR"), Beatrice Companies, Inc. (hereinafter "Beatrice"), Tropicana Products, Inc. (hereinafter "Tropicana Products"), and

Tropicana Products Sales, Inc. (hereinafter "Tropicana Sales").

The complaint contains eight counts.[1] Plaintiff has asserted claims under §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; under § 7 of the Clayton Act, 15 U.S.C. § 18; under state law; and under the Racketeering Influenced and Corrupt Organizations Act (hereinafter "RICO"), 28 U.S.C. § 1961 *et seq.* In a Memorandum and Order entered on July 28, 1987, this Court granted defendants' motion to dismiss with respect to plaintiff's RICO claim but denied it with respect to all other claims asserted here by plaintiff. Subsequently, by stipulation of the parties, KKR and Beatrice were dismissed as defendants in the case.

The remaining defendants, Tropicana Products and Tropicana Sales, have now moved for summary judgment as to all claims asserted against them. Plaintiff Purity has indicated that it is not opposing defendants' motion as to Count 1 (alleging unlawful monopolization under § 2 of the Sherman Act) and as to Count 7 (alleging breach by defendants of an oral distribution agreement). However, Purity has opposed the granting of summary judgment as to the five remaining counts of the complaint, namely Counts 2, 3, 4, 5 and 8.[2]

Exhaustive memoranda in support of and in opposition to the pending motion have been filed and reviewed by the Court. Attached to these memoranda are numerous and lengthy exhibits. Oral argument has been heard in open court. For the reasons to be stated herein, defendants' motion for summary judgment will be granted as to all remaining claims asserted against them by plaintiff in this case.

## I

### *Facts*

Defendant Tropicana Products is a Delaware corporation with its principal place of

---

1. Plaintiff's eight claims are termed "Causes of Action." They will be referred to as "Counts" herein.

2. As explained hereinafter, there are now only three Counts before the Court. Counts 2 and 3 actually raise a single claim under § 1 of the

Sherman Act, charging a conspiracy by the defendants to impose territorial restrictions on plaintiff in unlawful restraint of trade. Moreover, with the dismissal of defendants KKR and Beatrice, plaintiff cannot assert a Clayton Act claim. *See* 15 U.S.C. § 18.

business in Bradenton, Florida. Defendant Tropicana Sales is a wholly owned subsidiary of Tropicana Products. Tropicana Products is a nationwide seller of numerous citrus and other juice products. These products are sold in different types of containers and in a multitude of sizes. They are sold in a frozen concentrate, refrigerated (or chilled), or shelf-stable form. The latter two groupings are called "ready-to-serve."

Plaintiff Purity is a Maryland corporation with its principal place of business in Baltimore County. It was formed in 1973 by its owner and sole shareholder, Ivan Goldstein. Purity has since its formation been a distributor of various food products in the Baltimore/Washington market, as well as in other East Coast cities. Purity first began doing business with Tropicana Products in 1976 when it purchased orange juice in glass bottles from defendants' local food broker for sales to small grocery stores and restaurants in the Baltimore/Washington area. Purity's purchases of products through RMI Brokerage Co., the Baltimore broker of Tropicana products, in time increased to include ultimately all of defendants' juice and beverage products.

Purity remained an authorized reseller of defendants' products until December of 1985 when it was informed that commencing in 1986 Tropicana Products would no longer sell products directly to it. Plaintiff contends that as a result of defendants' decision to "terminate" it as a distributor,[3] plaintiff's business relations with its wholesaler and retailer juice customers were destroyed, that plaintiff has been unable to regularly supply Tropicana products to its wholesale customers at competitive prices, and that plaintiff's route distribution network in the Baltimore/Washington trade area has been severely disrupted.[4] In this civil action, plaintiff seeks injunctive relief and substantial damages for the wrongs allegedly committed by defendants.

Purity's dispute with defendants primarily challenges the territorial and customer allocation scheme of Tropicana Products in effect in the United States. Typically, Tropicana Sales utilizes a food broker specific to a particular sales territory. That broker assists defendants in the selling and distribution of Tropicana products to authorized independent wholesale distributors. Purity was just such an authorized wholesale distributor before defendants stopped selling to it. These wholesale distributors in turn resell Tropicana products to retailers, other wholesalers and other distributors. Retailers may also purchase products directly from Tropicana Sales.

However, in the New York metropolitan area, Tropicana Sales does not utilize food brokers in connection with sales of its non-frozen, ready-to-serve juice products.[5] Instead, Tropicana Sales uses its own direct sales force under its division called "Citrus Bowl." Citrus Bowl sells these products directly to large retailers and to certain authorized wholesale distributors, including dairies and routemen, who service smaller retail establishments. These routemen are independent businessmen who operate routes within the New York metropolitan area, delivering Tropicana products to smaller grocery stores and restaurants.

Tropicana Products has long had a policy of selling only to wholesalers who will agree to restrict their sales to retailers who are located in and who sell products in the same Nielsen territory[6] as that to which

---

**3.** The words "terminate" and "terminated," which have been used frequently by counsel for plaintiff in their briefs and arguments, appear to be misnomers. There was never any distribution or other agreement between plaintiff and defendants which might have been subject to termination.

**4.** Plaintiff Purity continues to sell other juice and beverage products, as well as some Tropicana products purchased from firms other than defendants.

**5.** Tropicana Products does use a food broker, the Deblinger Co., to assist in the distribution of its frozen concentrate products in the New York metropolitan area.

**6.** According to defendants' memorandum in support of the pending motion, the A.C. Nielsen Company compiles statistical measures of product sales which are broken down by region. These regions are called "Nielsen territories."

Tropicana Products has shipped the products. Defendants assert that this policy is imperative so that they may maintain quality control of their products. Defendants contend that only by controlling the shipping, handling and storage of their juice products throughout the distribution chain can Tropicana Products ensure the high quality of these extremely perishable items. Additionally, defendants assert that this territorial restriction policy ensures that they will properly be advised of the promotional performance of their resellers required in order for them to receive certain promotional allowances.

Plaintiff asserts that the sole reason for its termination as an authorized distributor was plaintiff's violation of defendants' policy prohibiting extraterritorial sales of Tropicana products to customers in the Citrus Bowl area.[7] Plaintiff contends that this policy imposes an unlawful restraint on interstate commerce and trade in violation of § 1 of the Sherman Act and of provisions of the Maryland Antitrust Act, Md. Comm.Law Code Ann. § 11–204(a)(1). Plaintiff also asserts that defendants thereby tortiously interfered with plaintiff's business relations, in violation of Maryland common law.

## II

### *The Claims*

Since the Court previously dismissed plaintiff's RICO claim (Count 6), and since plaintiff has not opposed the entry of summary judgment as to its claim of unlawful monopolization under § 2 of the Sherman Act (Count 1) and also as to its claim of breach of an oral contract (Count 7), there can be no more than five claims remaining in this case. In Count 2, plaintiff seeks a recovery under § 1 of the Sherman Act because of allegedly unlawful territorial restrictions. Count 3 is also brought under § 1 of the Sherman Act and charges that defendants entered into an unlawful agreement, combination and conspiracy in restraint of trade. Count 4 charges a violation of § 7 of the Clayton Act, 15 U.S.C. § 18, and Count 5 seeks a recovery under the Maryland Antitrust Act. Count 8 is brought under Maryland common law and charges defendants with tortious interference with plaintiff's business.

From the record here, it is apparent that there are in fact only three remaining claims. Since defendants KKR and Beatrice have been dismissed, plaintiff cannot in this case assert a claim under § 7 of the Clayton Act for unlawful acquisition to lessen competition or to create a monopoly. Moreover, it is apparent that Counts 2 and 3 overlap. Both of them are brought under § 1 of the Sherman Act, and both seek a recovery pursuant to allegations that defendants engaged in a conspiracy to impose territorial restrictions on plaintiff in unlawful restraint of trade.

## III

### *Summary Judgment Principles*

In their motion for summary judgment, defendants contend that there is a complete failure of proof as to essential elements of plaintiff's federal antitrust claims and that since these claims form the basis for the claims asserted by plaintiff under Maryland law, summary judgment should be entered in favor of defendants as to all counts of the complaint.

It is well settled that a defendant moving for summary judgment has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. Rule 56(c), F.R. Civ.P.; *see also Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir.1984). This burden may be met by consideration of affida-

---

**7.** Defendants assert that in addition to their concern about quality control, they were aware of Purity's misuse of promotional monies. Defendants in their memoranda have outlined an alleged scheme by which plaintiff bought Tropicana products in Virginia for less than it could in Maryland under a shell corporation and then immediately offered these goods for sale in vari-ous East Coast cities, including New York City. It is not necessary for the Court to resolve this dispute since it is apparent that the essential reason for defendants' refusal to deal with plaintiff as a distributor was its insistence that it had the right to make sales in the New York metropolitan area.

vits, exhibits, depositions and other discovery materials. *Id.*

One of the purposes of Rule 56 is to require a plaintiff, in advance of trial and after a motion for summary judgment has been filed and supported, to come forward with some minimal facts to show that a defendant may be liable under the claims alleged. *See* Rule 56(e). Moreover, " '[a] mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely.' " *Barwick, supra,* 736 F.2d at 958–59 (quoting *Seago v. North Carolina Theatres, Inc.,* 42 F.R. D. 627, 640 (E.D.N.C.1966), *aff'd,* 388 F.2d 987 (4th Cir.1967)). In the absence of such a minimal showing, a defendant should not be required to undergo the considerable expense of preparing for and participating in a trial. As Chief Judge Winter said in *Bland v. Norfolk and Southern Railroad Company,* 406 F.2d 863, 866 (4th Cir.1969):

> While a day in court may be a constitutional necessity when there are disputed questions of fact, the function of a motion for summary judgment is to smoke out if there is any case, *i.e.,* any genuine dispute as to any material fact, and, if there is no case, to conserve judicial time and energy by avoiding an unnecessary trial and by providing a speedy and efficient summary disposition.

Although the Supreme Court some 26 years ago cautioned that summary procedures are to be used "sparingly in complex antitrust litigation where motive and intent play leading roles," *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), more recent authority has recognized that Rule 56 is fully applicable in an antitrust case and that resort to its principles is appropriate in such a case in the same manner as in any other civil action. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Two recent Supreme Court decisions have clarified and expanded the principles applicable to a trial court's determination whether summary judgment in a civil action is to be granted. In *Anderson v.*

*Liberty Lobby Inc.,* 477 U.S. 242, 250–51, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986), the Supreme Court held that the standard for granting a motion for summary judgment under Rule 56 is the same as that for granting a directed verdict under Rule 50, F.R.Civ.P. The Court explained this standard as follows:

> [T]he judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. *The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient;* there must be evidence on which the jury could reasonably find for the plaintiff.

*Id.* at 252, 106 S.Ct. at 2512 (emphasis added).

In *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Court held that there is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323, 106 S.Ct. at 2553 (emphasis in original). In reaching this result, the Court observed:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.Rule.Civ.P. 1; see Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 467 (1984).... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Id.* at 327, 106 S.Ct. at 2555.

The Fourth Circuit recently discussed in *Felty v. Graves–Humphreys Co.,* 818 F.2d

1126 (4th Cir.1987), the Supreme Court's holdings in *Anderson* and *Catrett.* Judge Wilkinson emphasized in *Felty* that trial judges have "an affirmative obligation ... to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Id.* at 1128 (quoting *Catrett, supra,* 477 U.S. at 323–24, 106 S.Ct. at 2553–54).

In *Matsushita Electric Industrial Co. v. Zenith Radio Corp., supra* 475 U.S. at 574, 106 S.Ct. at 1348, the Supreme Court reversed a court of appeals' reversal of a district court's grant of summary judgment in an antitrust case involving issues of conspiracy. The Court noted that once the defendant has met its initial burden of demonstrating the failure of proof as to a necessary element of the cause of action, the plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. at 1356. Instead, the plaintiff must come forward with "specific facts showing that there is a *genuine issue for trial." Id.* at 587, 106 S.Ct. at 1356 (quoting Rule 56(e), F.R.Civ.P.) (emphasis in original). While the plaintiff is entitled to have all favorable inferences to be drawn from the evidence, *id.* at 587, 106 S.Ct. at 1356 (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)), the Court stated that "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Id.* 475 U.S. at 588, 106 S.Ct. at 1357.

Applying these principles to the facts of record in this case, this Court concludes that defendants' motion for summary judgment must be granted.

### IV

### *The Remaining Claims*

### (a)

### *General Principles*

When defendant Tropicana Products learned that plaintiff Purity was selling juice products in the metropolitan New York area in direct competition with sales efforts of the Citrus Bowl division of Tropicana Sales, it reminded Purity of defendants' policy restricting sales by distributors to retailers located in the same Nielsen territory to which defendants' products were shipped. Purity was confronted and told that defendants would continue to sell to it only if Purity agreed to resell the products solely in the trade area where it was located. Purity refused to accept these restrictions,[8] and in early 1986 Tropicana Products stopped selling products directly to Purity.

Naturally concerned with the resulting loss of business, plaintiff Purity has attempted to recoup its business losses by seeking to apply principles of federal and state antitrust and trade regulation law to the pertinent facts. In its complaint, plaintiff has included a laundry list of claimed violations of such law by defendants, including five antitrust claims, one RICO claim and two common law claims. In spite of extensive and lengthy discovery, there is now essentially only one remaining issue in this case, namely whether defendants have engaged in a conspiracy in restraint of trade in violation of § 1 of the Sherman Act when they refused to deal with plaintiff unless it agreed to the territorial restriction imposed.

As noted, the Court has previously dismissed plaintiff's RICO claim, and plaintiff itself has not opposed the granting of summary judgment as to its claim of monopolization under § 2 of the Sherman Act and as to its claim of breach of an oral agreement. Plaintiff's Clayton Act claim must fail because of its voluntary dismissal of defendants KKR and Beatrice. As explained more fully hereinafter, if plaintiff's federal antitrust claims are without merit, then there can be no recovery under the Maryland Antitrust Act nor under Maryland law for tortious interference with plaintiff's business. It is therefore solely the § 1 conspiracy claim which is determinative of all claims remaining in this case.

---

**8.** Mr. Goldstein took the position that he would sell Tropicana products "any place he could make a buck."

When the voluminous record here is considered in the light of the pertinent authorities, this Court concludes that plaintiff's § 1 claim must fail and that plaintiff therefore is not entitled to proceed to trial on any of the claims it has asserted. The facts here simply do not fit into a theory of any violation of § 1 of the Sherman Act by defendants.[9] The record discloses as a matter of law that defendants acted independently and unilaterally in refusing to deal with plaintiff Purity and that such independent conduct did not violate federal antitrust law. A manufacturer has the right to deal or refuse to deal with a particular distributor so long as it does so unilaterally. *United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919); *Terry's Floor Fashions, Inc. v. Burlington Industries, Inc.,* 763 F.2d 604, 610–11 (4th Cir.1985).

### (b)

### *Defendants' Contentions*

In support of their motion for summary judgment, defendants argue (1) that plaintiff has not shown that the alleged participants in the conspiracy charged (namely the territorial brokers and independent routemen) have the legal capacity to conspire; (2) that plaintiff's identification of the territorial brokers and independent routemen as co-conspirators is too vague and conclusory to meet the burden assumed by plaintiff in responding to the motion for summary judgment; (3) that evidence of concerted action is lacking inasmuch as the record here shows that defendants merely exercised their unilateral right to refuse to deal with plaintiff Purity when it would not comply with defendants' territorial restrictions; and (4) that insufficient evidence exists to defeat defendants' motion for summary judgment since the record here discloses as a matter of law that the restraint alleged was not unreasonable and did not have an anticompetitive effect.

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. The Supreme Court has construed the statute to apply only to that concerted activity which unreasonably restrains trade. *Standard Oil Co. v. United States,* 221 U.S. 1, 60, 31 S.Ct. 502, 515, 55 L.Ed. 619 (1911). Moreover, such unreasonable restraints must be "effected by a 'contract, combination, ... or conspiracy' between *separate* entities," for § 1 does not reach conduct that is independent or "wholly unilateral." *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984) (emphasis in original). As Chief Justice Burger pointed out in *Copperweld,* 467 U.S. at 767, 104 S.Ct. at 2739:

> The Sherman Act contains a "basic distinction between concerted and independent action." *Monsanto Co. v. Spray Rite Service Corp.,* 465 U.S. 752, 761 [104 S.Ct. 1464, 1469, 79 L.Ed.2d 775] (1984). The conduct of a single firm is governed by § 2 alone and is unlawful only when it threatens actual monopolization. It is not enough that a single firm appears to "restrain trade" unreasonably, for even a vigorous competitor may leave that impression.

■ In order to sustain a claim of conspiracy in violation of § 1 of the Sherman Act, plaintiff must therefore establish both (1) that a conspiracy, combination or agreement existed and (2) that such conspiracy, combination or agreement amounted to an undue restraint of trade. Defendants have argued at length that plaintiff has failed to meet both of these requirements. Since this Court has concluded that defendants acted unilaterally in refusing to deal with plaintiff Purity, it is not necessary to consider the many other arguments presented in support of and in opposition to defend-

---

**9.** As Circuit Judge Murnaghan pointed out in *Ottensmeyer v. Chesapeake & Potomac Telephone Co.,* 756 F.2d 986, 992 (4th Cir.1985),

when antitrust allegations "are simply thrown in as a shotgun approach for relief, we have

ants' motion for summary judgment.[10]

### (c)
### *Evidence of Concerted Action*

Since § 1 of the Sherman Act does not proscribe unilateral or independent action even if it restrains trade, the plaintiff must not only identify co-conspirators but also show that they participated in the conspiracy charged. Plaintiff contends that territorial brokers and independent routemen conspired with defendants to unreasonably restrain trade. Defendants argue that its brokers cannot conspire as a matter of law and that in any event, plaintiff has not sufficiently identified the alleged co-conspirators.

In view of this Court's conclusion that no concerted action has been shown, it is not necessary to discuss and rule on these preliminary questions. It will be assumed for the purpose of the Court's discussion of plaintiff's § 1 claim that both the territorial brokers and the independent routemen had the legal capacity to conspire with defendants,[11] and that the territorial brokers and independent routemen have been sufficiently identified by plaintiff to satisfy its burden in opposing the pending motion for summary judgment.[12] What is missing here is evidence that the independent routemen and brokers in question engaged in concerted action which resulted in defendants' decision to discontinue their dealings with plaintiff as a distributor of Tropicana brand products.

Defendants assert that they merely exercised their unilateral right to refuse to deal with Purity for its failure to comply with their well-established quality control policy. Plaintiff Purity responds that there is evidence from which it is reasonable to infer that defendants, together with the routemen and brokers as co-conspirators, engaged in concerted action to terminate price-cutters like Purity.

██ The applicable legal standards for determining whether plaintiff has adduced sufficient proof of concerted action to survive summary judgment in this antitrust case are well established. First, a manufacturer's mere refusal to supply a wholesale distributor does not violate § 1 of the Sherman Act, absent proof that it was pursuant to an unlawful conspiracy. *See Fran Welch Real Estate Sales, Inc. v. Seabrook Island Co.,* 809 F.2d 1030, 1033 (4th Cir.1987) (citing *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919)). Second, proof of such conspiracy cannot be established by evidence that a manufacturer terminated a distributor following, or even in response to, complaints by other competing distributors. *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 763, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984). Conduct "as consistent with permissible conduct as with [an] illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita, supra,* 475 U.S. at 588, 106 S.Ct. at 1357 (citing *Monsanto, supra,* 465 U.S. at 764, 104 S.Ct. at 1470). As the Court in *Monsanto* pointed out, "something more than evidence of complaints is needed. There must be evidence

granted a defendant's motion for summary judgment."

**10.** Defendants have presented forceful arguments that they did not have the necessary market power over the product in a defined geographic area to unreasonably restrain trade. They also assert that plaintiff cannot prove injury to interbrand competition. *See Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 52 n. 19, 97 S.Ct. 2549, 2558 n. 19, 53 L.Ed.2d 568 (1976). In view of the Court's conclusion that no § 1 conspiracy can be proved, it is not necessary to address these further questions.

**11.** It is settled now that a corporation cannot conspire with its own officers or employees nor with a wholly owned subsidiary. *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 769, 771, 104 S.Ct. 2731, 2740, 2741, 81 L.Ed.2d 628 (1984). However, independent brokers may under certain circumstances be co-conspirators within the meaning of § 1 of the Sherman Act. *See Pink Supply Corp. v. Hiebert, Inc.,* 788 F.2d 1313, 1316 (8th Cir.1986).

**12.** The cases relied upon by defendants all addressed the question of a plaintiff's proper identification of co-conspirators in the context of a motion to dismiss for lack of specific allegation of the identities in question. *See, e.g., Lombards, Inc. v. Prince Manufacturing, Inc.,* 753 F.2d 974, 975 (11th Cir.1985), *cert. denied,* 474 U.S. 1082, 106 S.Ct. 851, 88 L.Ed.2d 892 (1986).

which tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently." *Id.* at 764, 104 S.Ct. at 1471.

Plaintiff must produce sufficient evidence, either direct or circumstantial, for a jury to reasonably conclude that a territorial broker or an independent routeman joined one of the defendants in a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* at 764, 104 S.Ct. at 1471 (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981)). It is insufficient merely to show that the defendants sought to restrain competition, or that the defendants' decision to terminate Purity harmed competition. *See Garment District, Inc. v. Belk Stores Services, Inc.*, 799 F.2d 905, 910 (4th Cir.1986), *cert. denied*, — U.S. ——, 108 S.Ct. 1728, 100 L.Ed.2d 193 (1988). What the Court must determine in a case of this sort is whether on the evidence presented it can reasonably be determined that the termination of Purity as a distributor came about as a result of a conspiracy as opposed to independent action on the part of defendants.

The Fourth Circuit Court of Appeals applied the *Monsanto* analysis in *Terry's Floor Fashions, Inc. v. Burlington Industries, Inc., supra.* Plaintiff in that case was a terminated carpet distributor who alleged that a manufacturer had entered into a conspiracy to preclude plaintiff from becoming a principal commercial dealer for the manufacturer, that such conspiracy thereby assured the co-defendant, a competing dealer, of receiving more favorable prices, and that the manufacturer had also conspired to terminate plaintiff as a dealer for the manufacturer's carpets altogether. *Id.* at 612. Offered in support of the conspiracy was evidence (1) of an alleged agreement by the competing dealer to provide the manufacturer with a guaranteed dollar volume of sales per year in exchange for preferential pricing; (2) of a differential in the prices quoted by the manufacturer to plaintiff and to the competing dealer; and (3) of complaints made by the competing

dealer to the manufacturer concerning plaintiff's price-cutting practices. *Id.* at 612, 615.

Applying the evidentiary standard set forth in *Monsanto*, the Fourth Circuit found that the actions taken by the carpet manufacturer in instructing other distributors not to sell to plaintiff and its decision to terminate plaintiff's authorized distributorship were entirely consistent with the manufacturer's own sales policy which was part of its general marketing strategy. *Id.* at 614. Specifically, the carpet manufacturer had chosen, for price discounts designed to encourage promotional efforts, certain of its dealers in a particular territory who were also authorized distributors for other lines of carpet. *Id.* at 607. The manufacturer also had a so-called "anti-bootlegging policy," which prohibited sales by its dealers to other authorized dealers or to nonauthorized dealers. *Id.*

In an opinion written by Circuit Judge Sneeden and joined by Circuit Judge Hall, the Court found that plaintiff had not produced sufficient evidence to present a genuine issue of fact as to the existence of a conspiracy since plaintiff had failed to present evidence reasonably tending to prove "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* at 614 (citing *Monsanto, supra,* 465 U.S. at 764, 104 S.Ct. at 1470). The Fourth Circuit accordingly affirmed the district court's granting of summary judgment regarding all federal claims. *Id.* at 615. Both the majority and Chief Judge Winter, concurring specially, agreed that the test to be applied in a case of this sort is whether the plaintiff had failed to exclude the possibility that the manufacturer was acting independently. *Id.* at 614, 616.

■ In this case, the facts similarly do not establish that defendants and identified co-conspirators joined together in concerted activity. There is indeed evidence that Tropicana Products received and responded to complaints from routemen concerning plaintiff's extraterritorial sales in the New York area. Plaintiff also relies on evidence indicating that routemen and brokers re-

ported on the availability of extraterritorial products and identified the sources of these products.[13] Plaintiff contends that besides the complaints of underselling by the brokers and the routemen, Tropicana worked with these entities to monitor and enforce the territorial restrictions policy. Plaintiff argues that these additional activities reflect a conscious commitment by the parties to a scheme of excluding plaintiff from competition with the routemen in selling Tropicana products.

However, what was done by management and by the brokers and routemen was entirely consistent with the well-established policy of defendants that Citrus Bowl would be the exclusive source of the distribution of Tropicana products to wholesalers located in the New York trade area. The brokers and routemen played no active part in defendants' determination that they would no longer deal with plaintiff. Indeed, defendants' ultimate decision to discontinue selling to Purity stemmed from Ivan Goldstein's stated intention that he would continue to violate defendants' policy of territorial restrictions. The letter of December 13, 1985 from Karl Maggard, the Vice President of Sales of Tropicana Products, to Ivan Goldstein offered to continue to supply Purity if Purity would demonstrate that Tropicana products were not being diverted outside the Baltimore trade area for resale. Mr. Maggard explained that Tropicana Products had important quality control interests in enforcing territorial restrictions of its sales.[14] The record indicates that Mr. Goldstein refused to comply with Tropicana's policy and stated his intention of continuing to compete with defendants' own sales division by continuing to sell diverted products in the New York metropolitan area.

The purported participation of the routemen and the brokers in detecting and reporting violations of defendants' sales policy does not satisfy the concept of "a meeting of the minds" or "common scheme" to achieve an unlawful end, as required by *Monsanto, supra,* 465 U.S. at 764 n. 9, 104 S.Ct. at 1471 n. 9. Neither an overt nor a tacit understanding or agreement to carry out an illegal scheme existed between the parties. *See Morrison v. Murray Biscuit Co.,* 797 F.2d 1430, 1435 (7th Cir.1986) (no evidence of price fixing agreement between producer and broker). Indeed, Rudolph Wishner, Vice–President of Citrus Bowl, stated in his deposition (and there is no evidence to the contrary) that the enlisted routemen and brokers did not offer much support in identifying the sellers of diverted product. Communications between defendants and their alleged co-conspirators do not represent more than "internal dialogue leading to a decision on the part of a single business unit to select or disenfranchise a particular distributor." *Beckman v. Walter Kidde & Co.,* 316 F.Supp. 1321, 1326 (E.D.N.Y.1970), *aff'd per curiam,* 451 F.2d 593 (2d Cir.1971), *cert. denied,* 408 U.S. 922, 92 S.Ct. 2488, 33 L.Ed.2d 333 (1972). *See also Monsanto,* 465 U.S. at 762, 104 S.Ct. at 1470 ("A manufacturer and its distributors have legitimate reasons to exchange information about the prices and the reception of their products in the marketplace.") [15]

As facts purportedly showing the existence of an illegal conspiracy, plaintiff relies on evidence indicating that defendants color coded pallets of products to trace their destination, that defendants prepared reports identifying wholesalers whose high sales volume suggested extraterritorial sales, that Citrus Bowl contemplated the

---

**13.** According to plaintiff, a marketing committee consisting of route distributors and Citrus Bowl management was established to discuss, among other topics, the sale of Tropicana products diverted from other territories. However, the so-called Diversion Task Force was formed *after* defendants stopped doing business with plaintiff.

**14.** In his letter, Mr. Maggard pointed out that Tropicana products were perishable and suffered quality degradation if improperly shipped

and stored and that defendants did not want their products to undergo handling when not under defendants' control or knowledge.

**15.** Even evidence that one distributor has solicited the replacement by a manufacturer of an existing distributor has been held not to constitute a § 1 violation. *Universal Lite Distributors, Inc. v. Northwest Industries, Inc.,* 452 F.Supp. 1206, 1216 (D.Md.1978), *aff'd in pertinent part,* 602 F.2d 1173, 1175 (4th Cir.1979).

hiring of a detective service to help monitor and investigate extraterritorial sales and that Tropicana officials even considered a "sting operation" to accomplish such monitoring. But these were all acts undertaken by defendants acting independently. There is no evidence indicating that routemen or brokers participated in the decision to undertake acts of this sort designed to implement defendants' policy of not making sales to distributors who would not agree to sell only in their own particular Nielsen territory. Nor does the record show that routemen or brokers participated in the acts themselves. These facts of record then do not amount to proof of concerted activity on the part of the alleged co-conspirators.

Plaintiff's heavy reliance on *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), is misplaced. There, the manufacturer did not merely announce a price-fixing policy and then refuse to deal with a noncomplying retailer. *Id.* at 44, 80 S.Ct. at 511. Rather, the manufacturer "used the refusal to deal with the wholesalers in order to elicit their willingness to deny [manufacturer] products to retailers and thereby help gain the retailers' adherence." *Id.* at 45, 80 S.Ct. at 512. Moreover, the manufacturer approached certain large retailers and, upon securing their acquiescence to the policy, used such acquiescence as leverage with other retailers to fix prices. *Id.* at 46, 80 S.Ct. at 513. The Supreme Court held that by utilizing wholesalers and other retailers to actively induce unwilling retailers to comply with its pricing policy, the manufacturer created a combination or conspiracy with the wholesalers and retailers in violation of § 1 of the Sherman Act.

Actions undertaken by defendants here do not rise to the level of affirmative action by defendants and routemen (or brokers) "to achieve uniform adherence" to a sales policy. *Parke, Davis*, 362 U.S. at 47, 80 S.Ct. at 513. In response to complaints by routemen of diverted products, defendants merely asked such routemen to relay any information they had concerning the availability and source of the diverted product. Defendants did not actively work with their authorized customers to achieve policy goals and did not, as in *Parke, Davis*, involve both wholesalers and retailers in undertaking to induce others to comply with the established policy of territorial restrictions.

On the record here, this Court concludes that plaintiff has not produced sufficient evidence which "tends to exclude the possibility" that defendants acted independently and unilaterally rather than in concert with others as required by § 1 of the Sherman Act. *Terry's Floor Fashions, Inc., supra* at 614. In other words, plaintiff has not met its burden once this motion for summary judgment has been filed and supported to produce evidence indicating that an inference of conspiracy is reasonable in light of the competing inference of independent action by defendants. *See Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1357. Accordingly, plaintiff's claim under § 1 of the Sherman Act, as alleged in Counts 2 and 3 of the complaint, must fail.

### (d)
### *Maryland Antitrust Act*

■ Defendants have also moved for summary judgment as to Count 5 of the complaint, which has been brought under the Maryland Antitrust Act, Md.Comm. Law.Code Ann. § 11–204(a)(1)(1983). The parties agree, as they must, that this Court's application of the Maryland Antitrust Act to the facts of this case should be guided by the Court's similar interpretation of the federal antitrust statutes relied upon by plaintiff. *See, e.g., Neugebauer v. A.S. Abell Co.*, 474 F.Supp. 1053, 1071 (D.Md. 1979); *Quality Discount Tires, Inc. v. Firestone Tire & Rubber Co.*, 282 Md. 7, 12, 382 A.2d 867 (1978).

Plaintiff's assertion that defendants have violated § 11–204(a)(1) is duplicative of its allegations under § 1 of the Sherman Act, the federal analogue. Because plaintiff's federal antitrust claims must fail, summary judgment must likewise be granted in favor of defendants as to Count 5 of the complaint.

### (e)
### *Tortious Interference with Business Relations*

■ In Count 8 of the complaint, it is alleged that defendants tortiously inter-

fered with plaintiff's business. In opposing defendants' motion for summary judgment as to Count 8, plaintiff contends that it was terminated as a Tropicana distributor as a part of defendants' conduct in illegally restraining trade and that this termination substantially interfered with Purity's business and caused Purity to suffer economic loss. In support of their motion for summary judgment, defendants contend that plaintiff cannot show, as required by Maryland law, that their conduct was improper, inasmuch as defendants did not violate either federal or state antitrust laws. This Court would agree. In view of its rulings herein concerning plaintiff's antitrust claims, the Court concludes that summary judgment in favor of defendants is likewise appropriate as to plaintiff's claim of tortious interference with business relations.

Maryland courts have long recognized the tort of malicious interference with business relations. The tort consists of four elements:

(1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.

*Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 71, 485 A.2d 663 (1984). As indicated by *Catrett, supra*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53, summary judgment should be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case...."

Insofar as the third element is concerned, the Court's determination whether defendants' discontinuance of sales to Purity was done with unlawful purpose and without justifiable cause necessarily hinges on whether defendants' actions constitute a

violation of federal or state antitrust laws. *See Natural Design*, 302 Md. at 74, 485 A.2d 663. The unlawful purpose asserted here is defendants' alleged violation of federal and state antitrust law. Since this Court has determined that plaintiff's antitrust claims do not have a sufficient factual basis to survive defendants' motion for summary judgment, this Court must also conclude that plaintiff cannot on this record prevail in proving the third element of the tort, namely, that defendants acted with unlawful purpose and without justifiable cause.[16]

Accordingly, defendants' motion for summary judgment must likewise be granted as to plaintiff's claim for tortious interference with business relations, as alleged in Count 8 of the complaint.

## V

### *Conclusion*

For all these reasons, the motion for summary judgment of defendants Tropicana Products and Tropicana Sales will be granted as to all claims asserted against them by plaintiff. An appropriate Order will be entered.

---

**16.** Moreover, under Maryland law, one who, regardless of motive, causes harm to another merely by refusing to continue a business relationship terminable at will is not liable for that harm. *Cunningharm v. A.S. Abell Company*, 264 Md. 649, 658, 288 A.2d 157, *cert. denied*, 409 U.S. 865, 93 S.Ct. 160, 34 L.Ed.2d 114 (1972).