46 F.3d 1141
 1995-1 Trade Cases P 70,878
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
GLACIER OPTICAL, INC., a Washington corporation, Plaintiff-Appellant,
v.
OPTIQUE DU MONDE, a Delaware corporation; Safilo America,
Inc., a Delaware corporation, Defendants-Appellees.
 No. 93-35601.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted: Nov. 3, 1994.
Decided: Jan. 19, 1995.
 
 Before: FLETCHER, D.W. NELSON, and RYMER, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Appellant Glacier Optical, Inc. ("Glacier") brought suit against appellees Optique du Monde ("ODM") and Safilo America, Inc. ("Safilo") for claims arising from the termination of Glacier's relationship with appellees as a distributor of designer eyeglass frames. Glacier seeks damages based on theories of breach of contract, breach of implied covenant of good faith and fair dealing, tortious interference, and quasi-contract. In addition, it argues that the termination constituted a conspiracy in restraint of trade in violation of the Sherman Act, 15 U.S.C. Sec. 1. Appellees counterclaimed for monies owed by Glacier for previous purchases of eyeglass frames. The district court granted summary judgment in favor of appellees on all claims. We have jurisdiction under 28 U.S.C. Sec. 1291. We affirm.
 
 I.
 
 3
 Because this court reviews a grant of summary judgment de novo, Jesinger v. Nevada Federal Credit Union, 24 F.3d 1127, 1130 (9th Cir. 1994), we do not address Glacier's argument that the district court applied an improper standard for summary judgment. We affirm summary judgment if, viewing the evidence in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the district court correctly applied the relevant substantive law. Id. at 1130.
 
 II.
 
 4
 Glacier argues that its 1987 negotiations with ODM resulted in an oral contract for an exclusive distributorship which could not be terminated without substantial cause, and that ODM assured Glacier that the arrangement would continue so long as Glacier "did a good job" and "kept sales up." We hold that the Uniform Commercial Code (U.C.C.) statute of frauds bars Glacier's claim alleging breach of this contract.
 
 
 5
 The parties agree that Washington law governs Glacier's contract claims. Under the U.C.C. statute of frauds, Wash. Rev. Code Sec. 62A.2-201, a contract for a sale of goods worth $500.00 or more is unenforceable absent a writing. Id. Although Glacier's distributorship agreement with ODM contained significant service components, because the "dominant factor" in the agreement was the sale of eyeglass frames, the U.C.C. statute of frauds is applicable. See Sally Beauty Co. v. Nexxus Products Co., 801 F.2d 1001, 1005-06 (7th Cir. 1986) (citing numerous cases); Bonebrake v. Cox, 499 F.2d 951, 958-60 (8th Cir. 1974). The cases cited by appellees are not dispositive because they involve agreements predominantly for services. See Klinke v. Famous Recipe Fried Chicken, Inc., 616 P.2d 644, 646 (Wash. 1980); Orthomet, Inc. v. A.B. Medical, Inc., 990 F.2d 387, 389 (8th Cir. 1993).
 
 
 6
 Glacier's agreement, however, fails to satisfy the writing requirement. Under the U.C.C. statute of frauds, the writing must evidence a sale of goods, be signed by the party to be charged, and specify the quantity of goods to be sold. Alaska Indep. Fisherman's Mktg. Ass'n v. New England Fish Co., 548 P.2d 348, 351 (Wash. Ct. App. 1976). Under Washington law, a writing memorializing a requirements contract also must contain a quantity term. Id. at 352 (holding that the U.C.C. barred a contract for a sale of a fisherman's catch because the memorandum agreement, although noting prices and methods of weighing the fish, failed to give any indication of the quantity of fish to be purchased). Most of the writings offered by Glacier, even the letter referring to "oral agreements which can be amply documented," provide no semblance of a quantity term.
 
 
 7
 Although the 1989 handwritten "Customer Sales Report" provides monetary figures for past sales and predicted future sales, it does not signify an agreement to sell a specific quantity of goods. Even if the report's statement that Glacier "[p]urchased all products with small stock back up" and the cryptic numbers listed at the bottom of the report could be construed as an adequate quantity term, these statements of past sales are insufficient to establish a requirements contract. See Wash. Rev. Code Sec. 62A.2-201 (noting that "the contract is not enforceable ... beyond the quantity of goods shown in the writing").
 
 
 8
 The documents that discuss the proposed written agreement, including the grandfathering proposal, arguably indicate some sort of requirements contract. However, they cannot support the 1987 agreement because they relate to a 1991 deal, which was never consummated. Since both parties acknowledge that no agreement was reached on this proposal, it is insufficient "to indicate that a contract for sale has been made between the parties." Wash. Rev. Code Sec. 62A.2-201.
 
 
 9
 Glacier further argues that even without a writing, ODM's promise to commit the oral agreement to writing is sufficient to overcome the statute of frauds. The Washington Supreme Court, however, has held that a promise to memorialize an oral agreement cannot overcome the U.C.C. statute of frauds. Lige Dickson Co. v. Union Oil Co., 635 P.2d 103, 107 (Wash. 1981). Although Glacier also alludes to possible satisfaction of the requirements of the statute of frauds under the doctrine of part performance, this doctrine would permit enforcement in this case only with respect to goods already paid for or accepted. Wash. Rev. Code Sec. 62A.2-201(3)(c). Yet Glacier's principal claim, the wrongful termination of a long term agreement, does not fall within this limited scope. Accordingly, we find that Glacier's breach of contract claim is barred by the U.C.C. statute of frauds. We therefore need not address whether the claim is barred by the general Washington statute of frauds, Wash. Rev. Code Sec. 19.36.010.
 
 III.
 
 10
 We necessarily reject the claim of breach of the implied covenant of good faith and fair dealing. This covenant, although present in every contract, creates obligations only in relation to the agreed terms of the contract. See Badgett v. Security State Bank, 807 P.2d 356, 360-61 (Wash. 1991); Miller v. U.S. Bank of Washington, 865 P.2d 536, 542 (Wash. Ct. App. 1994). Because the statute of frauds bars the contract claim, there are no contract terms upon which to base an implied covenant of good faith and fair dealing. See Orthomet, Inc. v. A.B. Medical, Inc., 990 F.2d 387, 392 (8th Cir. 1993); McGowan v. Pillsbury Co., 723 F. Supp. 530, 539 (W.D. Wash. 1989). We therefore affirm the district court's grant of summary judgment on this claim.
 
 IV.
 
 11
 We also reject Glacier's claim of tortious interference with a business relationship. In Washington, a tortious interference claim arises when the defendant either seeks to harm the plaintiff or uses wrongful means to cause injury to the plaintiff's business relationships. Pleas v. City of Seattle, 774 P.2d 1158, 1163 (Wash. 1989). Glacier has failed to provide any evidence that ODM sought to harm Glacier or that ODM used improper methods. See Birkenwald Distrib. Co. v. Heublein, Inc., 776 P.2d 721, 727 (Wash. Ct. App. 1989) (dismissing claim for tortious interference arising from termination of distributor and supplier's refusal to approve distributor's transferee). Accordingly, we affirm the grant of summary judgment on this claim.
 
 V.
 
 12
 Glacier's quasi-contract claim also fails. In Washington, quasi-contract claims require a showing of unjust enrichment. Lynch v. Deaconess Medical Ctr., 776 P.2d 681, 683 (Wash. 1989). There is no evidence, other than Glacier's bare allegations, that ODM has received any external benefit arising from Glacier's marketing efforts. Nor has Glacier shown that it acted with an expectation of compensation for its marketing efforts. See VRG Corp. v. GKN Realty Corp., 641 A.2d 519, 526 (N.J. 1994); Jaqua v. Nike, Inc., 865 P.2d 442, 445 (Or. Ct. App. 1993). Consequently, we affirm the district court's grant of summary judgment on this claim.
 
 VI.
 
 13
 Glacier further asserts that Appellees violated the Sherman Act, 15 U.S.C. Sec. 1, by engaging in a "conspiracy in restraint of trade."[1] Id. We reject thisclaim because Glacier has not put forth sufficient evidence of horizontal restraint of trade, concerted action, or vertical price fixing.
 
 A.
 
 14
 We reject Glacier's threshold contention that ODM imposed a horizontal restraint of trade, which would constitute a per se violation of the Sherman Act. See United States v. Topco Assocs., Inc., 405 U.S. 596, 608 (1972). Because ODM both supplies frames to distributors like Glacier and sells frames directly to large retailers, it functions as a "dual distributor." Dimidowich v. Bell & Howell, 803 F.2d 1473, 1480 (9th Cir. 1986). Dual distributors' interactions with distributors for the most part constitute vertical, not horizontal, activity. See id. at 1481; Krehl v. Baskin-Robbins Ice Cream Co., 664 F.2d 1348, 1355 (9th Cir. 1982).
 
 
 15
 The fact that ODM is not a manufacturer does not alter this result. Krehl, 664 F.2d at 1355 n.18; see also Zidell Explorations, Inc. v. Conval Int'l, Ltd., 719 F.2d 1465, 1469 (9th Cir. 1983) (treating distributors under the same rules as manufacturers). Nor is our analysis affected by the fact that ODM sells competing brands, as well as its own Polo brand frames, directly to retailers. Since ODM supplies these same competing brands to Glacier, its product is a range of designer frames that still faces competition from other brands. See Dimidowich, 803 F.2d at 1480-81 & n.3 (finding that parties in relationships where a manufacturer sells to distributors but competes with them in a distinct service market are in a hybrid relationship that lends itself best to vertical relationship analysis and application of the rule of reason).
 
 
 16
 We also reject Glacier's assertion that ODM's interactions with its dealers through the Inner Council constituted horizontal restraint of trade. See United States v. General Motors Corp., 384 U.S. 127, 134-37 (1966) (finding horizontal activity when a group of Chevrolet dealers agreed to join together to persuade GM to prevent resales to discounters, then organized dealer participation in the policing of a new GM policy against such sales). Unlike in GM, the Inner Council was created by the supplier, ODM, to improve communication with the distributors, and discussion at its initial meeting ranged over a wide variety of topics. Although the group discussed sales to discount retailers, it reached no agreement on the issue, and there is no evidence that the distributors engaged in a collective scheme to impose and monitor restrictions on sales to discount retailers.
 
 B.
 
 17
 Glacier argues that ODM violated the Sherman Act by conspiring to secure adherence to a pricing policy. Because ODM's activities in this regard would be vertical, Glacier must show that ODM engaged in concerted action to establish price restraints. See Monsanto v. Spray-Rite Serv. Corp., 465 U.S. 752, 761 (1984) (stating that a party must show "concerted action" to restrain trade in order to establish a violation of Sec. 1 of the Sherman Act); Business Electronics Corp. v. Sharp Electronics Corp., 485 U.S. 717, 736 (1988) (holding that the only vertical restraints that create a per se antitrust violation are price-fixing schemes).[2] To overcome summary judgment, a plaintiff must produce "evidence that tends to exclude the possibility of independent action."[3] Id. at 768. We find that summary judgment was proper because Glacier has not provided sufficient evidence of either (1) concerted action or (2) price-fixing.
 
 1.
 
 18
 Glacier argues that it has presented ample evidence of concerted action between ODM and other distributors to restrain trade. This evidence consists of: (1) distributors' complaints to ODM about Glacier's sales to discounters; (2) ODM's threats to terminate distributors who sold to discounters; (3) ODM's monitoring and investigation of possible sales to discounters; and (4) meetings of the "Inner Council" to discuss discounting.
 
 
 19
 We find insufficient evidence to overcome summary judgment because none of this evidence contained the critical element of collective action by ODM and some other party to restrain trade. Because there is no indication that complaints to ODM resulted in collusion with distributors to exclude Glacier, such complaints do not establish concerted action. See Monsanto v. Spray-Rite Serv. Corp., 465 U.S. 752, 763 (1984); The Jeanery, Inc. v. James Jeans, Inc., 849 F.2d 1148, 1158-59 (9th Cir. 1988) (finding no concerted action even though a company official had responded to a dealer's complaint by saying that he would "take care of things"). Similarly, the fact that ODM unilaterally threatened to terminate individual distributors who sold to discounters does not establish concerted action by more than one party. The Jeanery, 849 F.2d at 1158-59. Although ODM apparently hired investigators and sought to keep track of its products to determine whether they reached discounters, such monitoring by a supplier does not constitute a conspiracy with others to restrain trade. See Purity Products, Inc. v. Tropicana Products, Inc., 702 F. Supp. 564, 573-74 (D. Md. 1988), aff'd 887 F.2d 1081 (4th Cir. 1989). Even the communications among ODM and the distributors at the meetings of the "Inner Council" did not establish that the parties were engaged in concerted action because the council did not reach any agreement on the issue of discount retailers. See O.S.C. Corp. v. Apple Computer, Inc., 792 F.2d 1464, 1468-69 (9th Cir. 1986); H.L. Hayden Co. of New York, Inc. v. Siemens Medical Sys., Inc., 879 F.2d 1005, 1015 (2d Cir. 1989).
 
 
 20
 Taken together, Glacier's evidence of complaints, threats, monitoring, and meetings with dealers is insufficient to establish concerted action. See The Jeanery, 849 F.2d at 1157 (granting summary judgment even though the plaintiff had provided evidence of complaints by other sellers to which the supplier responded that it would "take care of things," monitoring of prices, coercive tactics by the company to enforce prices, and the lack of a plausible business justification for the termination); O.S.C., 792 F.2d at 1468 (finding that complaints about mail order discounting, meetings between manufacturer and dealers, a statement by the manufacturer's president that something would be done about price erosion, evidence of coercion to force mail order prices up, and agreements to prevent dealers from advertising low prices, were "insufficient" to survive summary judgment).
 
 2.
 
 21
 We also find that Glacier has not shown sufficient evidence of price restraints. First, any evidence that ODM and its distributors conspired to restrict Glacier's customer base or to terminate its distributorship would only support an allegation of a non-price restraint. See Business Electronics, 485 U.S. at 726 (stating that an agreement to terminate a distributor because it has been cutting prices does not amount to a price restraint). Moreover, evidence that ODM attempted to prevent sales to discount retailers does not support a theory of price-fixing because ODM proffered a legitimate business explanation for its efforts: the protection of the image of the Polo products. See O.S.C. Corp. v. Apple Computer, Inc., 792 F.2d 1464, 1468 (9th Cir. 1986) (accepting manufacturer's explanation that termination of mail-order dealers was necessary to uphold standards for support services); Hayden, 879 F.2d at 1016.
 
 
 22
 Second, evidence that ODM sent out suggested price lists and communicated with distributors about their price levels is insufficient. See Monsanto, 465 U.S. at 762 (holding that regular discussions about prices and exchange of price information between supplier and distributors are legitimate and do not necessarily amount to price-fixing); Business Electronics, 485 U.S. at 721 (holding that suggested price lists are permitted).
 
 
 23
 Third, the discussions between ODM officials and representatives of Shopko and Wal-Mart did not constitute concerted action to fix prices. If a supplier requests that a distributor or retailer agree to sell at a certain price, communicated acquiescence by the retailer could establish concerted action of price-fixing. See Monsanto, 465 U.S. at 764 n. 9, 765; The Jeanery, 849 F.2d at 1160.
 
 
 24
 Neither Wal-Mart nor Shopko communicated such agreement. Unlike in Monsanto or The Jeanery, ODM did not ask that prices be set at a specific level. Moreover, neither company "acquiesced." Although Whitey Peterson of ODM did request that Wal-Mart keep its prices in line with those of other retailers, a Wal-Mart official had told ODM from the outset that it had no intention to discount heavily. Similarly, Charlie Schmall's inquiry regarding Shopko's intended pricing scheme and his statement that ODM "did not favor discounting" did not elicit acquiescence, since Shopko never reported that it had kept prices up and actually cut prices significantly soon after its meetings with ODM. We therefore find insufficient evidence of any price restraints.
 
 C.
 
 25
 Glacier's final antitrust argument is that the distributors conspired to allocate territories in violation of the Sherman Act. Whereas a horizontal territorial agreement is illegal per se, a vertical agreement is not. See United States v. Topco Assocs., Inc., 405 U.S. 596, 608 (1972). Glacier's reliance on Topco is misplaced. Although in Topco a single entity allocated territories to supermarket chains, that entity was a cooperative association of the chains and thus engaged in a horizontal restraint. See id. at 599. By contrast, in the present case, there is no evidence of discussions among distributors regarding territory; all such negotiations were conducted vertically, between ODM and individual distributors. The fact that ODM permitted the distributors to define their own territories does not transform the arrangement into a horizontal one. Consequently, there was no violation of the Sherman Act.
 
 VII.
 
 26
 Because there is no dispute that Glacier owes the monies at issue in appellees' counterclaim, Glacier's only basis for opposing the counterclaim is a claim for offset. Having upheld the district court on all other claims, we affirm the grant of summary judgment on the counterclaim.
 
 Conclusion
 
 27
 For the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir. R. 36-3
 
 
 [1]
 To establish a violation under Sec. 1, the following must be shown: (1) an agreement or conspiracy among two or more persons or distinct business entities; (2) intent to harm or restrain competition; and (3) actual restraint on competition. City of Vernon v. Southern California Edison Co., 955 F.2d 1361, 1365 (9th Cir.), cert. denied, 113 S. Ct. 305 (1992)
 
 
 [2]
 Although a vertical non-price restraint establishes a Sherman Act violation if it satisfies the "rule of reason," Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 49 (1977), Glacier has not presented evidence on market impact and therefore cannot satisfy the "rule of reason." See Thurman Industries, Inc. v. Pay 'N Pack Stores, Inc., 875 F.2d 1369, 1373 (9th Cir. 1989)
 
 
 [3]
 Although summary judgment analysis requires that the evidence be viewed in the light most favorable to the nonmoving party, in the specific context of Sec. 1, the court should "closely scrutinize the evidence ... to avoid the danger of improper antitrust condemnations." See The Jeanery, Inc. v. James Jeans, Inc., 849 F.2d 1148, 1152 (9th Cir. 1988). Ambiguous evidence cannot provide sufficient support for an inference of an antitrust violation to overcome summary judgment. See, e.g., id.; Landmark Dev. Corp. v. Chambers Corp., 752 F.2d 369, 372 (9th Cir. 1985); H.L. Hayden Co. of New York, Inc. v. Siemens Medical Sys., Inc., 879 F.2d 1005, 1016 (2d Cir. 1989)