**MICROBIX BIOSYSTEMS, INC. Plaintiff**

v.

**BIOWHITTAKER, INC., et al. Defendants**

**Abbott Laboratories Counterclaimant**

v.

**Microbix Biosystems, Inc. Counterclaim– Defendant**

**No. MJG–97–2525.**

United States District Court, D. Maryland.

March 28, 2000.

Joseph D. Edmondson, Jr., Foley and Lardner, Washington, DC, Daniel A. Small, Michael D. Hausfeld, Matthew F. Pawa, Cohen, Milstein, Hausfeld & Toll, Agnieszka Fryszman, Ann C. Yahner, Law Office, Washington, DC, for Plaintiff.

John Henry Lewin, Jr., Maria F. Howell, Venable Baetjer and Howard LLP, Baltimore, MD, Peter Thauer, East Rutherford, NJ, Jennifer M. Horn, Venable Baetjer and Howard LLP, Baltimore, MD, Robert P. Schlenger, Lord & Whip, Baltimore, MD, David M. Rosenzweig, Jeffrey I. Weinberger, Munger Tolles & Olson, Los Angeles, CA, Kenneth D. Greisman, Nicholas A. Poulos, Abbott Park, IL, for Defendants.

### MEMORANDUM AND ORDER RE PLAINTIFF'S CLAIMS

GARBIS, District Judge.

The Court has before it Defendants' Motion for Summary Judgment. The matter has been fully briefed. The Court has considered the materials submitted by the parties, held a hearing, and had the benefit of counsel's arguments.

## I. BACKGROUND

Plaintiff Microbix Biosystems, Inc. ("Plaintiff" or "Microbix")[1] brought this antitrust action against Defendants Abbott

---

1. Microbix manufactures and distributes specialty biologicals derived from mammalian and microbial cell culture. Microbix's prod-

Laboratories ("Abbott"),[2] BioWhittaker, Inc., and BioWhittaker Holdings, Inc. (collectively "BioWhittaker")[3] under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (West 1999).

At all times relevant hereto, Plaintiff attempted to develop, obtain FDA approval for, and market generic urokinase products that would compete with Abbott's products. Plaintiff alleges that after learning about Plaintiff's urokinase project, Abbott sought, and entered into, an exclusive supply agreement with BioWhittaker. The intent of the agreement was to deny Plaintiff access to BioWhittaker's HNK cells. Plaintiff alleges that this conduct violated the Sherman Act and caused Plaintiff's injury.

To provide a context for Plaintiff's allegations, the Court shall discuss the urokinase products at issue, the parties' conduct during the relevant period leading up to the lawsuit, the pertinent post-lawsuit events, and the procedural history.

## A. Urokinase Products

Urokinase is a protein enzyme used to dissolve blood clots in human veins or arteries.[4] Urokinase may be derived from human urine, genetically-engineered cells (recombinant urokinase) or tissue culture.[5]

Abbott dominates the urokinase market in the United States.[6] In the 1970s, Abbott developed a tissue-culture urokinase marketed under the trade name Abbokinase. In 1978, FDA approved Abbokinase for labeled (systemic) applications to treat blood clots in heart arteries (acute myocardial infarction) and blood clots in the lungs (pulmonary embolism). However, physicians have used Abbokinase primarily for off-label (catheter-directed) applications to treat other conditions, especially blood clots in the legs or acute peripheral arterial occlusion ("acute PAO").[7] In 1983, the

ucts, primarily antigens and plasmids, are sold to the diagnostics industry, universities, and research institutions.

2. Abbott manufactures, among others, urokinase products. Urokinase is a broad category of thrombolytics used for treating clinical conditions caused by blood clots. See Defs' Ex. 6; see also discussion infra §§ I.A.-B.

3. BioWhittaker supplied Human Neonatal Kidney ("HNK") cells approved by the Food and Drug Administration ("the FDA") for use in the production of urokinase. HNK cells approved by the FDA are a mandatory raw material for urokinase production. BioWhittaker was the only FDA-approved supplier of HNK cells. Until early 1999, BioWhittaker imported HNK cells from a clinic in Cali, Colombia, and sold the cells for use in urokinase manufacturing. After purchasing lots of primary HNK cells from BioWhittaker, a manufacturer grew, cultivated, and purified the cells before using them in producing urokinase.

4. Urokinase (a broad subset of thrombolytics) is a "plasminogen activator," namely, a substance that converts the human body's plasminogen into plasmin, which dissolves a key component of blood clots called thrombus or fibrin. See Genentech, Inc. v. Boehringer Mannheim GmbH, 989 F.Supp. 359, 361 (D.Mass.1997).

5. Only urokinase derived from tissue culture has been approved by FDA. Pl's Ex. 3 at 40; Pl's Ex. 4 at 67–68. Thus, urine-derived urokinase and recombinant urokinase are not relevant to this case.

6. Other companies (such as Genentech, Inc.) also produce thrombolytics. However, for purposes of this motion only, Defendants do not dispute Plaintiff's assertion that thrombolytics manufactured by other companies do not compete with Abbott's products.

7. Pl's Ex. 5 at 10, 36, 45–46, 71–74. Abbokinase also is used to treat blood clots in veins (deep vein thrombosis or "DVT"), in dialysis access grafts ("DAG"), and in coronary access bypass grafts ("CABG"). Id. at 68–73, 92–95; Defs' Ex. 10, 11. The primary users of Abbokinase are interventional radiologists and vascular surgeons. Interventional radiologists treat blood clots by administering drugs through catheters inserted into blood vessels under X-ray guidance. Pl's Ex. 6 at ¶ 5.

FDA approved OpenCath[8] (another urokinase product of Abbott) for labeled uses in the clearance of central venous catheters blocked by clotted blood. Up until 1993, Abbott had a monopoly in the relevant urokinase market because of Abbott's patents on Abbokinase. Abbokinase continued to dominate the market of urokinase for PAO and catheter clearance after the patents expired in 1993.[9]

### B. *The Parties' Conduct During the Relevant Period*

#### 1. *Microbix's Urokinase Project*

The expiration of Abbott's urokinase patents in 1993 provided an opportunity for Microbix to enter the urokinase market. In 1994, Microbix began an experimental program that resulted in a set of procedures for developing commercial quantities of urokinase from HNK cells. Microbix's generic urokinase products, if approved by FDA, would be marketed under the trade names ThromboClear and CathClear.[10]

As a small company with limited resources, it was not feasible for Microbix to undertake the urokinase project by itself. Thus, in 1995, Gensia Laboratories, Ltd. ("Gensia")[11] approached Microbix to discuss a potential partnership. In September 1996, Microbix and Gensia entered into a Development and License Agreement. Defs' Ex. 30. Under this agreement, in exchange for the exclusive right to develop, make, use, and sell ThromboClear in the United States, Gensia agreed to provide Microbix with milestone-based development funding.[12] Defs' Ex. 30; Defs' Ex. 6. In addition, Gensia agreed to support Microbix in its development efforts, to assist with the necessary regulatory filing with the FDA,[13] and to be primarily responsible for the scale-up and pivotal studies of the product's final formulation. *Id.*

While negotiations between Gensia and Microbix continued,[14] Microbix approached

---

8. OpenCath consists of the same active protein ingredients as those of Abbokinase even though OpenCath is formulated and packaged in a different manner. Long Aff. at ¶ 6. Abbokinase and OpenCath shall be referred to collectively as "Abbokinase."

9. For example, Abbott's 1995 marketing plan projected Abbott's urokinase market shares in the PAO market to be 97 percent. Pl's Ex. 5 at 74–77; Defs' Ex. 11 at A003831. For purposes of this motion, Defendants do not dispute Plaintiff's definition of the relevant market.

10. ThromboClear would compete with Abbokinase, and CathClear with OpenCath. ThromboClear and CathClear shall be referred to collectively as "ThromboClear."

11. Gensia is a California-based company that develops, manufactures, and markets injectable pharmaceuticals for worldwide markets.

12. The development time line called for Microbix to supply, and Gensia to purchase, experimental lots of urokinase for Gensia's formulation and manufacturing studies. Pl's Ex. 28; Pl's Ex. 24 at 220–21. Milestone payments were tied to the timely supply of these experimental lots. *Id.* The final milestone was set for the second quarter of 1998, when Microbix would begin scaling up a manufacturing facility to produce commercial quantities. *Id.*

13. In early 1996, Gensia sought and received confirmation from the FDA that urokinase was eligible for approval as a generic. Pl's Ex. 24 at 197–98; Pl's Ex. 25. As part of the approval process for generic products, an applicant must submit an "abbreviated new drug application" ("ANDA") to FDA. Approval through the ANDA process is less complicated and less time consuming than through a New Drug Application ("NDA") process (the route by which Abbokinase was approved).

14. Throughout 1996, Gensia was also in merger discussions with an Italian pharmaceutical company, SICOR. Speace Dep. at 35–37. The merger completed on February 28, 1997. *Id.*

BioWhittaker to discuss the purchase of HNK cells. In March 1996, Microbix audited BioWhittaker's Maryland facility to ensure BioWhittaker was in a position to serve as Microbix's HNK cell supply source. The audit did not identify any deficiencies. Microbix then proceeded to purchase small amounts of HNK cells from BioWhittaker for experimental purposes.[15]

Anticipating additional needs for HNK cells for eventual production of urokinase in commercial quantities, Microbix sought to secure BioWhittaker's commitment to a future supply. In August 1996, Microbix representatives met with Noel Buterbaugh ("Buterbaugh")[16] and allegedly obtained Buterbaugh's assurance that BioWhittaker could, and would, supply the HNK cells that Microbix would need.[17] Gastle Dec. ¶ 14. On April 16, 1997, BioWhittaker (through Buterbaugh) allegedly reaffirmed that it would supply cells to Microbix for a five-year period at a price of $300 per million cells.

15. For its initial product-development work, Microbix purchased one vial from one lot of HNK cells from BioWhittaker in 1995, and one vial each from four additional lots in 1996.

16. Buterbaugh is BioWhittaker's President and Chief Executive Officer.

17. During the meeting, Microbix and BioWhittaker also discussed an alternate supply source. Pl's Ex. 18 at 204, 213–14. Recognizing that a second source could take many years to qualify in view of the complex national and international regulatory requirements, BioWhittaker allegedly informed Microbix that there was no need to seek an alternate source, because BioWhittaker had a large inventory of cells, never had problems with supplying existing demands, and did not anticipate any problems in meeting future demands. Gastle Dec. ¶ 12; Pl's Ex. 18 at 194–96. Buterbaugh also allegedly represented to Microbix that BioWhittaker would not sign an exclusive sales agreement with anyone. Id. Moreover, BioWhittaker allegedly authorized Microbix to reference its Drug Master File

### 2. The Exclusive Supply Agreement Between Defendants

The record leaves unclear precisely what transpired during the negotiations between Microbix and BioWhittaker concerning the supply of HNK cells. Nevertheless, Plaintiff alleges that Abbott's conduct caused BioWhittaker to renege on its earlier assurances, thereby impeding Plaintiff's ability to obtain HNK cells. Specifically, in October 1996, a month after Abbott learned of Microbix as a potential competitor,[18] Abbott proposed to BioWhittaker an exclusive supply contract for HNK cells. Pl's Ex. 43, 44. In response, BioWhittaker proposed to Abbott a five-year exclusive contract to begin on January 1, 1997. Pl's Ex. 45. In May 1997, BioWhittaker informed Microbix that BioWhittaker would not accept any new orders for HNK cells from Microbix. On July 19, 1997, Abbott and BioWhittaker executed a five-year exclusive supply agreement for thirty-five lots of HNK cells per year at $397 per million cells.[19] The

("DMF") at FDA for regulatory approval purposes. Sparkuhl Dec. ¶ 7.

18. In September 1996, Abbott learned of Microbix's generic urokinase project in a press release. Pl's Ex. 36 at A017525–28; Pl's Ex. 5 at 132–34. Abbott then retained two firms to investigate potential competitors. Id. The investigation identified Microbix as the only potential competitor of Abbott. Id. Abbott's marketing personnel had estimated that a generic urokinase would take away 70 percent of the Abbokinase market share within 24 months and cause a 40 percent price reduction. Pl's Ex. 38 at A004679. Abbott then formed an "Anti–Generics Task Force" aimed at Microbix's urokinase project. Pl's Ex. 39 at A018116; Pl's Ex. 40 at 9–12.

19. BioWhittaker did not inform Microbix about the agreement. The agreement (made retroactive to January 1, 1997) increased the price of HNK cells by more than 50 percent. Pl's Ex. 46.

Although this was the first time Abbott had a formal agreement with BioWhittaker, Abbott's relationship with BioWhittaker dated

exclusive agreement prohibited BioWhittaker from selling HNK cell lots to anyone other than Abbott even when those lots did not conform to Abbott's specifications,[20] and even when Abbott had already rejected such lots. Because BioWhittaker refused to supply additional HNK cells to Microbix, Microbix attempted to negotiate a solution with BioWhittaker but failed. On August 6, 1997, Microbix filed the instant case against BioWhittaker.

### C. *Post Lawsuit Commencement Events*

#### 1. *FDA Actions*

In June 1998 (some ten months after the instant case was filed), the FDA informed Microbix and Gensia of concerns [21] regarding BioWhittaker's quality program on HNK cells. The FDA conducted a Good Manufacturing Practices ("GMPs") audit of BioWhittaker's HNK cell-product operations. After the audit, the FDA provided to BioWhittaker a "Form 483" advising the company of "objectionable conditions" [22] with respect to GMPs and violations of section 501(a)(2)(B) of the Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 501(a)(2)(B).

On September 18, 1998, in a Warning Letter to BioWhittaker, the FDA reiterated concerns about deficiencies [23] in BioWhittaker's manufacturing process and imposed an Import Alert (still in effect today), prohibiting the importation of HNK cells from Cali, Colombia. Thereafter, BioWhittaker repeatedly tried to address the FDA's concerns, but to no avail. Olsen Aff. at ¶¶ 7–12, 16–23 (describing BioWhittaker's efforts from August 1998

---

back to the 1970s, when Abbott and BioWhittaker worked jointly to obtain FDA approval for the Cali, Colombia source of HNK cells. Defs' Ex. 21 at 111–12; Long Aff. at ¶¶ 9–10. From 1976 to 1995, Abbott was BioWhittaker's only customer for HNK cells for use in urokinase production. Buterbaugh Aff. ¶ 6.

Another example of historical Abbott–BioWhittaker collaboration is that the NDA approved by the FDA for Abbokinase includes procedures jointly developed by Abbott and BioWhittaker relating to the screening, harvesting, processing, importation, and testing of HNK cells. Long Aff. at ¶¶ 5, 10. Abbott and BioWhittaker also worked together throughout the 1980s and into the 1990s to implement and update tests for viral and other types of contamination that could potentially be present in the cells. *Id.* at ¶¶ 12, 14.

**20.** For example, lots with less than 100 million cells were deemed non-conforming under Abbott's specifications, but under the agreement BioWhittaker agreed not to sell such lots to others. Apparently, the high cost of $397 per million cells reflects BioWhittaker's agreement to withhold the non-conforming cells from the market and destroying them. Pl's Ex. 50.

**21.** The FDA's primary concern was the possible viral contamination of the HNK cells. Microbix and Gensia attempted to put together a plan to remedy the quality control issues bearing on contamination. Pl's Ex. 69 at GS30705. Microbix alleges that the FDA's concerns "could be easily handled provided that the cell supplier cooperates." *Id.* However, there is no evidence that either Microbix or Gensia approached BioWhittaker to request cooperation in addressing FDA concerns, or that BioWhittaker refused to cooperate.

**22.** The deficiencies identified by the FDA included: (1) use of HIV and Hepatitis–C test kits that were not FDA-approved, and no assurance that testing for viruses was performed correctly by adequately trained personnel; (2) inadequate screening of mothers and neonates with respect to risk factors of infectious diseases; (3) failure to follow certain standard operating procedures identified in the Drug Master File; (4) use of shipping containers that had not been proven safe; (5) failure to monitor storage temperatures of HNK cells in liquid nitrogen; and (6) storage of cells in a manner that could allow them to become contaminated. Olsen Aff. at ¶ 6; Defs' Ex. 54; Defs' Ex. 55.

**23.** *See supra* note 22 and accompanying text.

to present to resolve, unsuccessfully, the FDA audit issues).

Similarly, in October and November of 1998, the FDA inspected Abbott's urokinase-manufacturing operations and issued a Form 483, citing numerous violations of GMPs.[24] Beginning in November 1998, the FDA imposed a hold on the release for sale of all lots of Abbokinase.[25]

On July 2, 1999, the FDA advised BioWhittaker that it considered all of BioWhittaker's HNK cells to be "adulterated" within the meaning of FDCA. Pl's Ex. U to Olsen Aff. Thus, the Import Alert issued on September 18, 1998 continued to be in effect. From Abbott's and BioWhittaker's standpoint, it appeared that short of destroying the imported HNK cells and all urokinase manufactured from them, Abbott and BioWhittaker would be unable to address the FDA's safety concerns regarding the HNK cells previously imported by BioWhittaker. Olsen Aff. at ¶¶ 13–14. Therefore, on November 23, 1999, Abbott sent a letter to the FDA confirming that, with the exception of small samples that would be retained for testing purposes, Abbott would destroy all remaining Abbokinase inventory and all remaining lots of BioWhittaker cells. Defs' Long Aff. at ¶ 28; Ex. C to Long Aff.

### 2. *The Preliminary Injunction*

By April of 1998, Microbix had completed the experimental phase of the urokinase project and was ready to begin commercial manufacturing. As the next step, Microbix planned to enter into a contract with Creative BioMolecules ("CBM"), a manufacturing facility in New Hampshire. To convince CBM that Microbix would have enough HNK cells to proceed, on April 9, 1998, Microbix moved for a preliminary injunction requesting, *inter alia*, a three-year supply of cells from BioWhittaker. *See* Defs' Ex. 3 (May 13, 1998 Hearing Transcript).

On May 13, 1998, this Court issued the preliminary injunction, essentially granting all relief requested by Microbix. The injunction required BioWhittaker to, *inter alia*, (1) sell Microbix 20 lots of FDA-compliant cells at $397 per million cells for a three-year period (or until BioWhittaker prevails in the litigation) and (2) allow Microbix to reference BioWhittaker's DMF at the FDA for regulatory approval purposes.

### 3. *Termination of the Gensia–Microbix Partnership*

In June 1998, after the Court issued a preliminary injunction granting relief to Microbix on May 13, 1998, Microbix and Gensia began discussions concerning the status of their partnership. It appears that despite the relief granted under the preliminary injunction,[26] various factors

---

**24.** On July 14, 1999, the FDA issued Abbott a Warning Letter with respect to the same violations.

**25.** To alleviate the shortages of supplies, in January 1999, the FDA released nine lots of Abbokinase for sale by Abbott. However, on January 25, 1999, the FDA sent a letter to all health care providers concerning the status of Abbokinase, cautioning the providers to use Abbokinase only when absolutely necessary because of concerns related to potential for viral contamination. The FDA has not permitted Abbott to sell any additional urokinase. Thus, virtually all supplies available to physicians have been exhausted.

**26.** Defs' Ex. 31 at 86, 121–36; Ex. 32 at GS40866–67; Ex. 34 at 301–07. Prior to the preliminary injunction, Gensia had informed Microbix that Gensia would feel "comfortable with a three-year strategic supply of cells." Defs' Ex. 31 at 69. Microbix President William Gastle ("Gastle") later testified at his deposition that "I assumed that based on the strength of the [May 13, 1998] preliminary injunction we had addressed [the cell-supply] issue." Ex. 34 at 307. When Microbix informed Gensia that the Court had ordered BioWhittaker to sell Microbix enough HNK cells to produce a two- to three-year supply of product, Gensia concluded that the result was "satisfactory." Defs' Ex. 31 at 87.

nevertheless led Gensia to re-consider its partnership with Microbix.[27] First, Microbix requested Gensia to make additional financial commitments. However, Gensia refused this request "due to cash constraints in the corporation," concluding that Gensia "did not have the ability to fund $18 million in capital investment or working capital investment." Defs' Ex. 31 at 118–19, 139. Second, Gensia was concerned that the cost of producing urokinase would be higher than projected originally. Defs' Ex. 31 at 146–47, 152–54; Defs' Ex. 35 at GS40064–65. Third, Gensia's merger with another company, SICOR, might have changed the risk profile of Gensia's preferred investments and strategic decision. Defs' Ex. 41 at 131–33; Defs' Ex. 34 at 376–77; Defs' Ex. 36. Finally, Microbix's failure to secure a contract manufacturing facility for the commercial production of its urokinase product also might be a contributing factor. Defs' Ex. 16 at MBX002333; Defs' Ex. 3 at 38.[28] Apparently, CBM, the company that Microbix had intended to use as its manufacturing facility for commercial production,

would not enter into a contract with Microbix without significant financial guarantees from Gensia. Defs' Ex. 31 at 107–10, 116–20; Defs' Ex. 33 at GS21889–91; Defs' Ex. 34 at 269–76, 384–85.

In spite of the preliminary injunction, and after the September 18, 1998 FDA ban on import of HNK cells, Microbix and Gensia terminated their Development and License Agreement in November of 1998.[29]

#### 4. *Closing of Cali, Colombia Cell Source*

The Cali, Colombia clinic that provided the HNK cells to BioWhittaker no longer produces HNK cells.[30] Duenas Aff. ¶¶ 5–7. The clinic's founder, Dr. Alvaro Duenas, closed his clinic after being kidnaped by terrorists and released. *Id.* In addition, Dr. Duenas and BioWhittaker agreed to, and did, dispose of all remaining HNK cell cultures at the clinic in Cali in November 1999. Buterbaugh Aff. ¶¶ 15–16; Duenas Aff. ¶¶ 9–10. BioWhittaker presently does not have access to any other source of HNK cells that can be sold for use in the

27. Plaintiff alleges that Gensia expressed concern to Microbix that it "may not have the raw material to produce ThromboClear in the long term," and thus Gensia was reluctant to invest "large sums of money" in view of the uncertainty concerning long-term HNK cell supply. Pl's Opp. at 22; Pl's Ex. 24 at 318–319. However, there is no evidence that the lack of long-term supply was a material or substantial reason for Gensia to re-consider the partnership with Microbix. To the contrary, it appears that Gensia Vice–President Thomas Speace's ("Speace") testimony, read in context, indicates that Gensia was satisfied with a three-year supply granted under the May 13, 1998 preliminary injunction. *See* Pl's Ex. 24 at 67, 69, 87, 108–110, 115, 117–18, 126, 139, 344–45, 397.

28. The FDA has informed Microbix that the commercial manufacturing facility must be ready for inspection by the agency at the time Microbix files its request for regulatory approval of the product. Defs' Ex. 39 at

MBX014023; Defs' Ex. 40 at 228. At the May 1998 hearing on the preliminary injunction motion, Gastle testified that if the Court granted Microbix the right to purchase 20 lots of HNK cells, it would be able to conclude a contract manufacturing agreement with CBM. Defs' Ex. 3 at 41:11–12, 44:18–45:1, 47:24–48:3, 54:7–11. After the preliminary injunction was granted, however, Microbix failed to do so. Defs' Ex. 41 at 130–31, 204–06. It appears that Microbix and CBM were unable to agree on certain financial guarantees and indemnification provisions that CBM was demanding. Def's Ex. 34 at 269–71, 300–03; Defs' Ex. 41 at 80–82, 130–31.

29. Microbix's subsequent attempts to enter into partnerships with other companies (such as American Pharmaceutical Partners, Inc.) failed. Pl's Ex. 65.

30. For present purposes, it is immaterial that the clinic may remain operational for other purposes.

manufacture of urokinase. Buterbaugh Aff. at ¶¶ 15, 17.

### D. *Procedural History*

Plaintiff's lawsuit, filed on August 6, 1997, alleged the following claims against BioWhittaker:

| Cause of Action (Number) | Claim |
| --- | --- |
| First | Violation of Section 1, Sherman Act |
| Second | Violation of Section 2, Sherman Act |
| Third | Misrepresentation |
| Fourth | Promissory Estoppel |
| Fifth | Declaratory Relief |

On June 16, 1998, Microbix filed the First Amended Complaint alleging the following claims against BioWhittaker and Abbott:

| Cause of Action (Number) | Claim | Defendant(s) |
| --- | --- | --- |
| First | Violation of Section 1, Sherman Act | BioWhittaker & Abbott |
| Second | Violation of Section 2, Sherman Act | BioWhittaker & Abbott |
| Third | Misrepresentation | BioWhittaker [31] |
| Fourth | Promissory Estoppel | BioWhittaker |
| Fifth | Declaratory Relief | BioWhittaker |
| Sixth | Interference With Economic Relationships | Abbott |

On August 12, 1998, Abbott counterclaimed against Microbix for (1) theft of trade secrets, (2) unfair competition, and (3) tortious interference with contracts. On September 30, 1999, the Court dismissed with prejudice the unfair competition and tortious interference counterclaims.[32]

Defendants now move for summary judgment[33] on the antitrust claims pursuant to Rule 56 of the Federal Rules of Civil Procedures.[34]

## II. LEGAL PRINCIPLES

### A. *Summary Judgment Standard*

A motion for summary judgment shall be granted if the pleadings and supporting documents "show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The well-established principles pertinent to such motions can be distilled to a simple statement.

The Court must look at the evidence presented in regard to the motion for summary judgment through the non-movant's rose colored glasses, but must view it realistically. After so doing, the essential question is whether a reasonable fact finder could return a verdict for the non-

**31.** The Court has severed the claims made only against BioWhittaker (the Third, Fourth, and Fifth Causes of Action of the First Amended Complaint). Because these claims have been asserted in a separate lawsuit, Civil Action No. MJG–98–4094, which was filed on December 15, 1998, the Court shall dismiss these claims as duplicative in the instant case.

**32.** The parties agree that the unfair competition and tortious interference counterclaims are preempted by the Illinois Trade Secrets Act, upon which the theft of trade secrets counterclaim rests. *See* 765 Ill. Comp. Stat. Ann. 1065/8 (West 1999).

**33.** Plaintiff has moved for summary judgment on the remaining theft of trade secrets coun-

terclaim. The Court shall resolve that motion separately.

**34.** Defendants have not moved for summary judgment on the Sixth Cause of Action (interference with economic relationships). However, as stated in the Court's February 14, 2000 letter to counsel, the viability of the interference claim depends upon the viability of the antitrust claims. *See* Feb. 14, 2000 Court's Letter to Counsel. Thus, to the extent that the interference claim will be discussed in this memorandum, the discussion will focus on the viability of the claim in view of the Court's ruling on the antitrust claims. *See* discussion below.

movant or whether the movant would, at trial, be entitled to judgment as a matter of law. *See, e.g. Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir.1991).

### B. *Relevant Antitrust Laws*

#### 1. *Clayton Act*

Section 4 of the Clayton Act establishes the right of private litigants to bring suit to recover damages under the antitrust laws. That section provides in relevant part:

> [A]ny person [35] who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15 (West 1999).

#### 2. *Sherman Act*

Section 1 of the Sherman Act provides in relevant part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal.

15 U.S.C. § 1 (West 1999).

Moreover, section 2 of the Sherman Act provides in relevant part:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 2 (West 1999).

## III. *DISCUSSION*

Plaintiff alleges that Defendants' conduct violated sections 1 and 2 of the Sherman Act [36] and caused Plaintiff's injury. Under section 4 of the Clayton Act,[37] a corporation may sue to recover treble damages if it can show (1) a violation of the antitrust laws, (2) an injury to its business or property, and (3) a causal relationship between the antitrust violation and its injury. *Bigelow v. RKO Pictures, Inc.,* 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946).

### A. *Violation of Antitrust Laws*

#### 1. *Liability Under Section 1, Sherman Act*

Plaintiff alleges that Defendants violated section 1 of the Sherman act, 15 U.S.C. § 1 (West 1999) ("section 1"), by engaging in a conspiracy in restraint of trade.[38] To prevail under section 1, a plaintiff must prove that (1) there was a contract, combination or conspiracy, (2) the agreement unreason-

---

**35.** The term " 'person' . . . shall be deemed to include corporations[.]" 15 U.S.C. § 12(a) (West 1999).

**36.** 15 U.S.C. §§ 1, 2 (West 1999).

**37.** 15 U.S.C. § 15 (West 1999).

**38.** First Amend. Compl. at ¶¶ 48–57. The First Cause of Action also alleges that Defen-

dants engaged in a group boycott in violation of section 1. *Id.* However, the Court shall not address the group boycott allegation, because Microbix does not raise this issue in its Opposition. Accordingly, the Court shall address only the allegation concerning a conspiracy in restraint of trade.

ably restrained trade, and (3) the restraint affected interstate commerce. *Terry's Floor Fashions, Inc. v. Burlington Industries, Inc.,* 763 F.2d 604, 605–15 (4th Cir. 1985); *Bhan v. NME Hospitals, Inc.,* 929 F.2d 1404, 1410 (9th Cir.1991). For present purposes, Defendants do not dispute the adequacy of the evidence concerning elements (1) and (3). Thus, the only issue presented is whether Defendants' conduct unreasonably restrained trade.

To assess the reasonableness of a restraint on trade, courts have taken one of two approaches: the *per se* rule or the rule of reason. The first approach—the *per se* rule—applies to "agreements whose nature and necessary effect are so plainly anti-competitive that no elaborate study of the industry is needed to establish their illegality—they are 'illegal *per se.*'" *National Society of Professional Engineers v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978).[39]

The second approach—the rule of reason—has been used to determine whether a particular restraint, which is not illegal *per se,* unreasonably restrains trade and thus violates the Sherman Act. *See Stan-*

dard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *Terry's Floor Fashions,* 763 F.2d at 605–15. This rule applies to cases that are not easily classified because they involve aspects of vertical restraints.[40] *See, e.g., Donald B. Rice Tire Co. v. Michelin Tire Corp.,* 638 F.2d 15 (4th Cir.), *cert. denied,* 454 U.S. 864, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981); *Copy–Data Systems, Inc. v. Toshiba America, Inc.,* 663 F.2d 405 (2d Cir.1981); *Abadir & Co. v. First Mississippi Corp.,* 651 F.2d 422 (5th Cir. 1981). Under the rule-of-reason analysis, both the anti-competitive and pro-competitive effects of the restraint on the relevant market[41] must be considered. *GTE Sylvania,* 433 U.S. at 39–48, 97 S.Ct. 2549. Further, in undertaking this analysis, courts focus on the effects of the defendants' conduct on interbrand competition.[42] *Id.* at 52 n. 19, 97 S.Ct. 2549; *Copy–Data Systems, Inc.,* 663 F.2d at 406–08.

■ The Court finds that the second approach to analyzing restraints, the rule of reason, is applicable to this case.[43] As

---

**39.** Examples of *per se* violations include price fixings and group boycotts. *See, e.g., United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (price fixing); *FTC v. Superior Court Trial Lawyers Ass'n,* 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990) (group boycott).

**40.** Vertical restraints involve contracts among parties at different levels in the production and marketing chain (for example, a manufacturer and a supplier of raw material), whereas horizontal restraints involve agreements among direct competitors. *See, e.g., Klor's, Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 119 S.Ct. 493, 498, 142 L.Ed.2d 510 (1998).

**41.** The "relevant market" consists of the relevant geographic market and the relevant product market.

**42.** The primary concern of antitrust law is interbrand competition, not intrabrand competition. *GTE Sylvania,* 433 U.S. at 39–48, 52 n. 19, 97 S.Ct. 2549. The distinction between the effects of restrictive conduct on intrabrand competition and interbrand competition is that while intrabrand competition is competition among those who sell the product of a particular manufacturer, interbrand competition is "competition among the manufacturers of the same generic product." *Id.* at 52 n. 19, 97 S.Ct. 2549.

**43.** This case does not involve horizontal restraints such as price fixing. Therefore, the *per se* rule is inapplicable. *See, e.g., Socony–Vacuum Oil Co.,* 310 U.S. at 150, 60 S.Ct. 811.

noted above, the rule of reason typically requires a full-fledged inquiry into the pro-competitive and anti-competitive effects of a restraint on the relevant market. *Donald B. Rice Tire Co. v. Michelin Tire Corp.*, 483 F.Supp. 750, 755 (D.Md.), *aff'd*, 638 F.2d 15 (4th Cir.), *cert. denied*, 454 U.S. 864, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981). However, some courts have, as an alternative to this approach, applied the so-called "quick look" (or "truncated") rule of reason in cases where the anti-competitive effects of the defendants' conduct are obvious. *Oksanen v. Page Memorial Hospital*, 945 F.2d 696, 709 (4th Cir.1991). If the alleged anti-competitive effects of a conduct, though not illegal *per se*, are so apparent as to merit only a "quick look," then "a detailed inquiry ... is not essential[.]" *Id.; see also California Dental Assoc. v. FTC*, 526 U.S. 756, 119 S.Ct. 1604, 143 L.Ed.2d 935 (1999).

Application of the quick-look rule of reason to the instant case is appropriate, because the anti-competitive effects of Defendants' conduct on the relevant market can be easily determined. As noted above, the relevant product market is the United States[44] market for urokinase in catheter-directed applications. In this market, BioWhittaker is the only FDA-approved supplier of HNK cells, which are an essential raw material for producing tissue-culture urokinase. Abbott is the only company producing tissue-culture urokinase for the U.S. market.

■ Plaintiff contends that prior to Microbix's efforts to develop a competing generic urokinase product, Abbokinase faced little or no competition.[45] After learning that Microbix was a potential competitor, Abbott entered into an exclusive supply agreement with BioWhittaker. The agreement effectively denied Microbix access to the only source of FDA-approved HNK cells. The need to develop an alternative HNK cell source presented a significant entry barrier to the urokinase market. If Plaintiff can establish these facts, the anti-competitive effects of the exclusive agreement would be obvious. Applying the quick-look[46] rule of reason, the Court concludes that, on the assumptions pertinent to the instant motion, the Defendants' collective conduct unreasonably restrained trade, in violation of section 1.[47]

■ Even if, under the rule of reason, the Court were to undertake a full inquiry into the legitimate business purposes and anti-competitive effects of Defendants' conduct, the inquiry would be of no help to

---

44. It is undisputed that the relevant geographic market is the United States.

45. Because of Abbott's market power, the company's profits were substantial. *See* Pl's Ex. 11 at A009813–14. For purposes of this motion, Defendants do not dispute this fact.

46. The Court notes, but need not discuss, that for the same reasons that the exclusive supply agreement is an unreasonable restraint of trade under the quick-look rule of reason, the agreement also may be unreasonable as an exclusive-dealing arrangement that was intended to, and did, keep all potential competitors of Abbott out of the relevant market. *See Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 45, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) ("In determining whether an exclu-sive-dealing contract is unreasonable, the proper focus is on the structure of the market for the products or services in question—the number of sellers and buyers in the market, the volume of their business, and the ease with which buyers and sellers can redirect their purchases or sales to others. Exclusive dealing is an unreasonable restraint on trade only when a significant fraction of buyers or sellers are frozen out of a market by the exclusive deal.") (citation omitted).

47. Where, as here, there is no dispute over the actual conduct of defendants, the issue of whether the actions by defendants constitute an "unreasonable" restraint of trade is a question of law. *See, e.g., Ferguson v. Greater Pocatello Chamber of Commerce, Inc.*, 848 F.2d 976 (9th Cir.1988).

Defendants. The anti-competitive effects of the conduct would outweigh the pro-competitive virtues.

Defendants argue that they each had legitimate business reasons for entering into the agreement at issue. Specifically, they allege that Abbott entered into the agreement because it wanted to (1) secure a stable supply of HNK cells from BioWhittaker for urokinase production to meet increasing demands for Abbokinase during the 1990s, (2) obtain an adequate level of supply of HNK cells per year to increase the likelihood of obtaining enough high-yielding lots to meet production requirements, and (3) protect its investment in BioWhittaker and prevent free-riding by Microbix.[48] Defs' Mem. at 34–35; *see also supra* note 19 and accompanying text. Moreover, they allege that BioWhittaker entered into the agreement because it desired (1) to eliminate the uncertainty concerning Abbott's future demands of HNK cells from Abbott due to the possibility of the use of genetically-engineered cells as a substitute and (2) to "broaden its partnership"[49] with Abbott.

There is ample evidence to support a finding that the Defendants' proffered "legitimate business purposes" are pretextual. *See Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358 (3d Cir.1992). Viewing the record in the light most favorable to Plaintiff, the Court concludes that a reasonable fact finder could find that Abbott executed the exclusive agreement specifically to prevent Microbix from entering the urokinase market. As to Defendants' intent, Abbott's internal documents state that the agreement "was an element of [Abbott's] strategy to protect the market position of Abbokinase," and that the

agreement was executed because of "concerns about potential generic competition and to ensure continuation of supply and high quality starting materials[.]" Pl's Ex. 49 (A000406–407). In short, the purpose of the agreement was to "assure that other groups could not utilize the cells for production" of urokinase. Pl's Ex. 1 at 48.

There is no evidence that BioWhittaker ever threatened Abbott's HNK cell supply or even suggested it would be unable to meet Abbott's needs. Pl's Ex. 2 at 67–68; Pl's Ex. 51 at 54. BioWhittaker and Abbott never discussed the concerns about continuation of supply and quality of HNK cells in their contract negotiations. Pl's Ex. 44 at 166.

BioWhittaker's agreement to destroy all excess cells that are non-conforming to Abbott's specifications would not be a sensible way to protect against supply interruptions. Pl's Ex. 50 at A000086 (BioWhittaker agreed to destroy all excess cells not sold to Abbott). Finally, contrary to Defendants' contention, the exclusive agreement was not the only means for ensuring a steady supply of HNK cells. A requirements contract (as opposed to an exclusive arrangement) could have secured a stable supply of HNK cells that Abbott would need for its urokinase production. Such a contractual arrangement, without an exclusivity feature, would be adequate to protect Abbott's "investment" in BioWhittaker, because BioWhittaker would continue to satisfy Abbott's needs first. Since Microbix would be allowed to purchase only the excess cells, there would be little, or no, "free riding."

As to BioWhittaker's reasons, there is no evidence that BioWhittaker's desire to "broaden the partnership" with Abbott

---

48. Abbott had been working with BioWhittaker to develop the Cali, Colombia cell source and the DMF.

49. BioWhittaker allegedly wanted Abbott to take the steps necessary to qualify BioWhittaker as a supplier of a number of other *Abbott products*, including cell culture media and reagent products. Defs' Ex. 51 at 54–56.

would be served under the exclusive supply agreement. The agreement did not require Abbott to purchase any product other than HNK cells from BioWhittaker and did not require Abbott to qualify BioWhittaker to serve as a vendor for any of Abbott's products. *See* Defs' Ex. 1 (contract) ¶ 8.3. Abbott understood it was not obligated to purchase any product other than HNK cells. *See* Bernsen Dep., Pl's Ex. 2, at 150–52. The contract called for Abbott to issue reports to BioWhittaker every six months on Abbott's activities toward qualifying BioWhittaker as a supplier of other products, but in fact no such reports were ever provided to BioWhittaker. *Id.* ¶ 6.2; Pl's Ex. 81 at 4. Nor did the contract eliminate the uncertainty concerning future demands if recombinant urokinase (derived from genetically-engineered cells) were approved by FDA. The contract did not provide BioWhittaker with any assurance of continued sales into the future if Abbott introduced a recombinant urokinase or if Abbott ceased to use HNK cells for any reason. Defs' Ex. 1 (contract) ¶ 8.3.

In addition, it appears that the prospect of a recombinant product from Abbott had no bearing on BioWhittaker's decision to enter into the contract. In negotiating the contract, BioWhittaker made no inquiry to determine how likely it was that Abbott would introduce a recombinant product. Adams Depo., Pl's Ex. 82 at 252–53. The potential development of a recombinant product was never discussed in the negotiations. Calvert Depo., Pl's Ex. 44 at 5. Finally, Abbott informed BioWhittaker

that "the recombinant derived urokinase was still quite a ways off." Pl's Ex. 51 at 54–55.

Defendants argue that because another source of HNK cells was available, the anti-competitive effects of the exclusive supply agreement "were minimal or nonexistent." Defs' Mem. at 36–37. To support this argument, Defendants point out that (1) Plaintiff represented to the FDA that Plaintiff could find another HNK cell source, (2) the preliminary injunction gave Microbix the right to purchase the cells that Microbix would need to bring its urokinase product to market without delay, and (3) the agreement was irrelevant in view of the FDA ban on import of HNK cells and the closure of the Cali, Colombia clinic. *Id.* This argument is disingenuous.

Defendants ignore the fact that BioWhittaker was the only supplier of *FDA-approved* HNK cells. It is undisputed that the "alternate" source cannot supply HNK cells until it has been qualified by the FDA. Given the uncertainty concerning the regulatory process (nationally and internationally) in qualifying such a source, and the need for funding necessary for qualification, one cannot reasonably deem the "alternate" source to be a substitute for the Cali source. Moreover, Defendants' anti-competitive conduct is determined as of the time the conduct occurred, not thereafter.[50] Therefore, the subsequent events (preliminary injunction, FDA ban, and closure of HNK cell clinic), though relevant to the discussion of causation and damages, are not pertinent in assessing the effects of the alleged anti-

---

50. *See, e.g., Little Caesar Enterprises, Inc. v. Smith,* 34 F.Supp.2d 459, 487 (E.D.Mich. 1998) (in case alleging illegal tie-in established at beginning of franchise relationship, relevant time to measure market power was time that tie-in was established); *General Industries, Corp. v. Hartz Mountain Corp.,* 810 F.2d 795, 806–07 (8th Cir.1987) (in attempted monopoly claim, dangerous probability that

defendant can achieve monopoly should be evaluated as of the time the alleged anti-competitive events occurred); *Oahu Gas Service, Inc. v. Pacific Resources, Inc.,* 838 F.2d 360, 363 (9th Cir.1988) (relevant period for purposes of allegations of exclusionary conduct was from 1972 to 1983; case went to trial in 1985).

competitive conduct on the relevant market.

In view of the above discussion, the Court concludes that a fact finder could reasonably conclude that the proffered "legitimate business reasons" for the exclusive agreement are pretextual. *See Big Apple BMW*, 974 F.2d at 1358–60. Moreover, even if the reasons were not pretextual, a fact finder could conclude that the anti-competitive effects of Defendants' exclusive supply agreement outweigh any pro-competitive virtues.[51] Accordingly, summary judgment is inappropriate with respect to the issue of illegality under section 1.

### 2. *Liability Under Section 2, Sherman Act*

Plaintiff alleges that Defendants used the exclusive supply agreement to maintain its alleged monopoly in the urokinase market, in violation of section 2 of the Sherman Act, 15 U.S.C. § 2 (1999) ("section 2").[52] To prevail under section 2, a Plaintiff must show "(1) the possession of *monopoly power* in the relevant market and (2) the *willful acquisition or maintenance of that power* as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct.

1698, 16 L.Ed.2d 778 (1966) (emphases added).

#### a. *Monopoly Power*

■ Plaintiff contends that Abbott had a monopoly in the relevant market, namely, the market of acute PAO and catheter clearance.[53] Defendants contend that Microbix cannot establish a Section 2 claim because Abbott has no market share *now* in the relevant market due to the FDA ban on HNK cells and Abbott's destruction of the remaining HNK cells and Abbokinase inventory.

Defendants' argument is without merit. Abbott's monopoly power is determined as of the time the alleged monopolization occurred.[54] In this case, there is evidence that Abbott possessed monopoly power in the relevant market when the exclusive agreement was entered into. Abbott's own marketing plan for 1995 projected Abbott's urokinase market share in the acute PAO and catheter clearance market as 97 percent. Abbokinase has dominated catheter-directed thrombolysis treatment throughout the 1990s even though Abbokinase was more expensive than other thrombolytics per treatment. *See* Pl's Ex. 5 (Devlin Depo.) at 77–79; Defs' Ex. 11 at A003832; Defs' Ex. 10 at A005924. Moreover, Abbott has never changed the price of Abbokinase in response to the price of anoth-

---

**51.** By depriving Microbix of the only source of FDA-approved HNK cells from BioWhittaker, Defendants' conduct had the ultimate effect of keeping a potential interbrand competitor out of the urokinase market for acute PAO and catheter clearance. *GTE Sylvania*, 433 U.S. at 52 n. 19, 97 S.Ct. 2549. ("extreme example of a deficiency of interbrand competition is ... where there is only one manufacturer"); *see also Jefferson Parish Hosp. Dist. No. 2*, 466 U.S. at 31–35, 104 S.Ct. 1551; *Chuck's Feed & Seed Co. v. Ralston Purina Co.*, 810 F.2d 1289, 1294 (4th Cir.), *cert. denied*, 484 U.S. 827, 108 S.Ct. 94, 98 L.Ed.2d 55 (1987).

**52.** First Amend. Compl. at ¶¶ 59–61. This section of the First Amended Complaint is entitled "Conspiracy to Maintain Monopoly." *Id.* The actual allegations, however, describe a cause of action for maintenance of monopoly by Abbott. *Id.* Moreover, although the Complaint alleges a "Conspiracy to Monopolize," Plaintiff does not raise this issue in its Opposition. *See* Pl's Opp. at 47–48. Thus, the Court shall address only the maintenance issue.

**53.** For purposes of the instant motion, Defendants do not dispute Plaintiff's definition of the relevant market.

**54.** *See* cases cited in *supra* note 50.

er thrombolytic, a surgical procedure, or a device. Pl's Ex. 8 (Morrison Dep.) at 164–67. In fact, Abbott has regularly raised prices for Abbokinase throughout the 1990s while other thrombolytic prices have been stable or have declined. Pl's Ex. 12 (Beyer Report) at ¶ 19 & Ex. 1, 2. As a result of this market dominance, Abbott expected and obtained substantial profits from the sales of urokinase. Sales of Abbokinase grew from $7 million in 1985 to nearly $300 million in 1998, and was projected to reach $335 million in 1999.[55] Pl's Ex. 8 at 584, 614; Pl's Ex. 9, 10. Abbott's profits margins for Abbokinase had been seventy percent or more. Pl's Ex. 11 (A009813–14). Accordingly, a fact finder could reasonably conclude that Abbott had a monopoly power in the relevant market.

b. *Wilful Acquisition or Maintenance of Monopoly Power* [56]

■ Plaintiff alleges that the exclusive agreement evidenced Abbott's wilful maintenance of its monopoly power in the relevant market by denying Microbix access to HNK cells. Defendants dispute this allegation, arguing that Abbott and BioWhittaker had valid business reasons for their agreement.

As discussed above, there is evidence from which a fact finder could reasonably conclude that Defendants' proffered "legitimate business purposes" are pretextual.[57]

From the evidence, a fact finder also could conclude that Abbott wilfully maintained its monopoly power in the relevant market.[58]

In view of the foregoing discussion, the Court concludes that Plaintiff's evidence creates a genuine dispute of material facts as to whether Defendants, through the exclusive supply agreement, wilfully maintained the monopoly power in the relevant market, in violation of section 2.

2. *Injury to Business or Property*

In addition to proving violation of the antitrust laws (namely, sections 1 and 2 of the Sherman Act), Plaintiff must also prove the fact of injury to its "business or property" by reason of the violation. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 561–63, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *Wilder Enterprises, Inc. v. Allied Artists Pictures Corp.*, 632 F.2d 1135, 1139 (4th Cir.1980). In essence, Plaintiff must prove "antitrust injury" to recover damages. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *Stearns v. Genrad, Inc.*, 752 F.2d 942, 945 (4th Cir.1984) ("A violation of the antitrust laws is not compensable unless the violation has occasioned an antitrust injury.") (citations omitted). The Supreme Court explained this requirement in *Brunswick:* [59]

---

55. For purposes of this motion, Defendants agree to this projected growth in revenues derived from sales of Abbokinase.

56. The Second Cause of Action alleges that Defendants (1) engaged in an illegal monopolization, in violation of section 2, and (2) are liable under the "essential facility" doctrine. First Amend. Compl. at ¶¶ 59–66. However, because Plaintiff does not raise the essential-facility issue in its Opposition, the Court shall not discuss the issue.

57. *See* discussion *supra*.

58. *See* discussion *supra*.

59. In *Brunswick*, the owners of several small bowling alleys claimed that a bowling equipment manufacturer (Brunswick) violated Section 7 of the Clayton Act by acquiring bankrupt bowling alleys that competed with plaintiffs. *Brunswick*, 429 U.S. at 479–89, 97 S.Ct. 690. The plaintiffs argued that had Brunswick not intervened, the bankrupt bowling alleys would have left the market, enabling the plaintiffs to earn higher profits. *Id.* The Supreme Court rejected these claims, emphasizing that the asserted injury flowed not from any reduction in competition, but from competition itself. *Id.*

Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. *Brunswick,* 429 U.S. at 489, 97 S.Ct. 690.

If "antitrust injury" (or fact of damages) has been established, Plaintiff may recover the amount of damages it has sustained and lost future profits. *Zenith Radio Corp. v. Hazeltine Research Inc.,* 401 U.S. 321, 338–39, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); *Terrell v. Household Goods Carriers' Bureau,* 494 F.2d 16, 22–25 (5th Cir. 1974), *cert. dismissed,* 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974). The fact of damages, however, must be established with "a fair degree of certainty."[60] *Terrell,* 494 F.2d at 22–25; *McClure v. Undersea Industries, Inc.,* 671 F.2d 1287, 1289 (11th Cir.1982), *cert. denied,* 460 U.S. 1037, 103 S.Ct. 1427, 75 L.Ed.2d 788 (1983). Damages are unrecoverable if the fact of damages is speculative or their amount and nature unprovable. *Hazeltine,* 401 U.S. at 338–39, 91 S.Ct. 795.

In this case, Plaintiff alleges that the lack of long-term HNK-cell supply (brought about by the exclusive supply agreement between Defendants) caused damages resulting from (a) Gensia's termination of the Gensia–Microbix partnership and (b) lost future profits.

#### a. *Damages Sustained from Partnership Termination*

■ Plaintiff claims that the monetary damages resulting from Gensia's termination represent the amount owed by Gensia to Microbix under the Development and License Agreement.[61] Defendants argue, however, that Gensia's termination of the partnership is irrelevant to this case. Even if the termination were relevant, Defendants contend, there is no evidence that the exclusive supply agreement was a material cause of Gensia's termination decision.

To recover the alleged damages, Plaintiff must present evidence that the damages flowed directly from the exclusive supply agreement. As discussed herein, Plaintiff has failed to present evidence adequate to support a finding of such damages.[62]

---

**60.** The Supreme Court provided guidance as to Plaintiff's burden of proof in *Hazeltine:*

[Plaintiff's] burden of proving the fact of damages under § 4 of the Clayton Act is satisfied by its proof of *some* damages flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under § 4.

*Hazeltine,* 395 U.S. at 114 n. 9, 89 S.Ct. 1562 (emphasis in original). However, even though a private plaintiff successfully proves an "antitrust injury," recovery will be allowed only if Plaintiff can establish a theory of monetary damages by which the amount of injury suffered reasonably can be determined. *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946). The standard of proof required to ascertain the

*amount* of damages is not as exacting as that required to prove the *fact* of damages (antitrust injury). *Id.*

**61.** These damages include the milestone funding from Gensia, funding which was necessary to enable Microbix to accomplish basic tasks. Pl's Mem. at 36. Moreover, Microbix lost expected payments from Gensia, including payments owed for pilot urokinase batches delivered to Gensia but not paid. *Id.*

**62.** Since Plaintiff cannot prove such damages, there can be no recovery even if Plaintiff did sustain damages from the *termination* itself. Such damages, if not derived directly from the exclusive supply agreement, can only be recovered against Gensia. Apparently, Gensia and Microbix entered into a "Settlement Agreement and Release" concerning Gensia's termination of the partnership. *See* Defs' Ex. 38.

Plaintiff has not presented evidence, other than conclusory allegations, that the lack of a long-term supply of HNK cells was a *material* cause of Gensia's termination decision. At best, the evidence presented by Plaintiff shows that the exclusive agreement was one of the many factors—but not a substantial factor—contributing to Gensia's termination decision. Indeed, the evidence does not permit a finding that Gensia would have remained in the partnership even though confronted by (1) the FDA ban,[63] (2) Gensia's unwillingness to make the financial commitments that Microbix requested, (3) the closure of the Cali, Colombia cell source, and (4) Microbix's failure to enter into a partnership with a manufacturing facility.

To the contrary, there is evidence that the preliminary injunction, which granted the request Plaintiff had requested, was satisfactory in terms of resolving the HNK-cell problem from both Gensia's and Microbix's perspectives. *See* Defs' Ex. 3 (May 13, 1998 Hearing Transcript). Thus, Plaintiff has failed to present evidence adequate to prove that the exclusive supply agreement was a material cause of the partnership termination.

In view of the above discussion, the Court concludes that the evidence submitted by Plaintiff does not permit a reasonable finding that Gensia's termination of the partnership flowed directly from the exclusive supply agreement. Accordingly, summary judgment is appropriate with respect to this issue.

### b. *Lost Future Profits*

Plaintiff claims that it has sustained loss of future profits because of the exclusive supply agreement. Specifically, Plaintiff contends that had it not been excluded from the market, Plaintiff would have realized profits ranging between $60 to $95 million (before trebling).[64] Defendants contend, however, that such damages, if any could be proved at all, would not flow from the exclusive supply agreement but from other independent factors.

The Court finds that Plaintiff's claim concerning loss of future profits is too speculative. According to the Plaintiff's expert's testimony, the estimated lost future profits are based, in large part, upon the anticipated future profits from the sales of urokinase. However, in claiming lost future profits, Plaintiff ignores the fact that it has not yet completed all the requisite tasks for bringing the urokinase product to market. In other words, for the damages to be of the amount claimed (or any amount for that matter), one must assume that Plaintiff would have successfully secured a manufacturing facility, obtained FDA approval, developed the urokinase in commercial quantities, and marketed the product during the relevant time frame. However, the evidence does not permit a finding that these tasks would have been completed prior to the occurrence of the other intervening factors[65] that severed any chain of causation.

---

**63.** For example, it is undisputed that the FDA banned the import of HNK cells on September 18, 1998, and that Gensia terminated its partnership with Microbix after the ban, in November of 1998. In the absence of contrary evidence, a reasonable inference could be made that the FDA ban was a substantial factor contributing to the lack of long-term supply of HNK cells, which materially caused Gensia to end the partnership.

**64.** In calculating these damages, Plaintiff's expert economist (Dr. Beyer) took into account the money owed to Microbix by Gensia under the Gensia–Microbix partnership.

**65.** These factors include, as discussed above, the FDA ban on HNK-cell import, the termination of the Gensia–Microbix partnership, and the closure of the Cali, Colombia cell source.

There is evidence that Microbix did not plan to file an ANDA for ThromboClear with the FDA until, at the earliest, the fourth quarter of 1998. *See* Pl's Ex. 53 at 40844. In fact, Plaintiff's own expert testified that even if the urokinase project were on track, the date for filing the ANDA could be as late as July 1999. Defs' Ex. 50 at ¶ 46. Allowing twelve months for FDA review and approval of ANDA, the marketing of ThromboClear would not occur until as late as August 2000. *Id.* at ¶¶ 46–47. In view of this evidence, Plaintiff cannot reasonably argue that but for the exclusive supply agreement, it would have brought ThromboClear to market before other intervening causes occurred.

Even assuming that Microbix could have brought ThromboClear to market before the intervening causes happened, Microbix still cannot reasonably claim lost "profits," because under the Gensia–Microbix partnership, Microbix would not have any share of profits from urokinase sales until the year 2002. *See* Defs' Ex. 35. Specifically, although the Gensia–Microbix partnership provided for royalty payments to Microbix, an internal memorandum of Gensia dated July 2, 1998, indicates that the projected Microbix's share of the profits from 1998 through 2001 was zero. *Id.* at GS40067–70. Stated differently, even if ThromboClear could be marketed as planned, Microbix would not have any share in the profits until the year 2002, by which time the independent factors would have impacted Microbix's urokinase production due to the lack of HNK cells. *Id.*

The Court concludes that Plaintiff has failed to present evidence of damages with a sufficient degree of certainty to permit a finding for Plaintiff. Summary judgment is appropriate.

3. *Causation* [66]

■ An antitrust plaintiff must present evidence of causation between the defendant's anti-competitive conduct and the alleged injury to withstand summary judgment.[67] *Advance Business Systems and Supply Co. v. SCM Corp.*, 415 F.2d 55, 63 (4th Cir.1969), *cert. denied*, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970). That is, a plaintiff must establish that the alleged illegal conduct at issue was "a substantial or materially contributing factor" in its injury. *Malcolm v. Marathon Oil Co.*, 642 F.2d 845, 860 (5th Cir.1981); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) (illegal conduct must be "shown to be material cause of the injury").

The conduct that caused the plaintiff's injury can be proven either by direct evidence or on the basis of circumstantial evidence and inference. *Hazeltine Research, Inc.*, 395 U.S. at 125, 89 S.Ct. 1562. However, evidence that is merely speculative will not satisfy this burden. *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 41 (2d Cir.1986) (lack of causation in fact is fatal to the merits of any antitrust claim), *cert. denied*, 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987).

**66.** Causation is closely related to the antitrust injury element.

**67.** *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1495–96 (8th Cir.1992) (affirming summary judgment where plaintiff failed to produce sufficient evidence to demonstrate that injury had not been caused by factors other than alleged anti-competitive conduct), *cert. denied*, 506 U.S. 1080, 113 S.Ct. 1048, 122 L.Ed.2d 356 (1993); *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 401–04 (7th Cir.1993), *cert. denied*, 510 U.S. 1111, 114 S.Ct. 1054, 127 L.Ed.2d 375 (1994) (affirming summary judgment based on evidence of alternative causal factors, where plaintiff could not establish that alleged antitrust violation "was a material element of, and substantial factor in producing, the injury").

In this case, Plaintiff has not presented evidence adequate to prove with a fair degree of certainty that the exclusive supply agreement was a material cause of the alleged injury. Plaintiff's evidence shows, at best, that its alleged injury was caused by a host of factors. Plaintiff cannot prove that, but for the exclusivity agreement, its damages would have been less than it sustained due to the FDA ban and other "innocent" causes.

Plaintiff argues that the FDA ban could have been avoided had Defendants not engaged in anti-competitive conduct. Plaintiff argues that had BioWhittaker cooperated with Microbix and given it another opportunity, Plaintiff would have audited BioWhittaker, discovered the deficiencies that FDA identified, and solved the problems to the satisfaction of FDA. Plaintiff's expert testified that an audit could have taken place sometime in 1997, shortly after Microbix developed "appropriate specifications." Defs' Ex. 14. However, this testimony is contrary to facts, thus not meeting the requirements under Rule 56(e) of the Federal Rules of Civil Procedure ("Rule 56(e)").[68]

It is undisputed that Microbix audited BioWhittaker in March of 1996 and found no deficiencies later identified by FDA. Defs' Ex. 23 at MBX001677. Moreover, there is no evidence that Microbix planned to audit BioWhittaker again before the FDA's audit in August of 1998. The March 1996 audit report indicated that the next audit of BioWhittaker would be due "within 12 months of the date of the start of production of licensed product by Microbix." *Id.* According to Microbix's plans before the exclusive supply agreement was entered into, commercial production of urokinase would not begin until, at the earliest, the second quarter of 1998.[69] Pl's Opposition at 12.

Moreover, there is no evidence that Microbix ever requested BioWhittaker to allow Microbix to conduct another audit. Microbix appears to argue that such request would be unrealistic because BioWhittaker took a "hostile position" toward Microbix. However, even if BioWhittaker were uncooperative, at the May 13, 1998 hearing Microbix could have requested that this Court permit Microbix to conduct another audit of BioWhittaker. Tellingly, Microbix never made such a request.

---

**68.** Rule 56(e) requires the party opposing a summary judgment to "set forth *specific facts*" establishing the presence of a genuine issue. Fed.R.Civ.P. 56(e) (emphasis added). Thus, expert affidavits or opinions must be based on specific facts. An expert's "naked opinions," though admissible at trial, may not suffice to defeat summary judgment. *See Mid–State Fertilizer Co. v. Exchange National Bank,* 877 F.2d 1333 (7th Cir.1989).

In *Mid–State Fertilizer,* the plaintiff opposed summary judgment with an affidavit by a finance professor who opined that the defendant's practices were unreasonable and inappropriate. *Id.* at 1339. The court granted summary judgment for the defendant and the Seventh Circuit affirmed, stating that the affiant "presented nothing but conclusions—no facts, no hint of an inferential process, no discussion of hypotheses," whereas expert af-

fidavits can defeat summary judgment only if they show "a process of reasoning beginning from a firm foundation." *Id.See also Estate of Detwiler v. Offenbecher,* 728 F.Supp. 103, 139–40 (S.D.N.Y.1989) (expert affidavits must be "based upon specific facts"); *In re "Agent Orange" Prod. Liab. Litig.,* 818 F.2d 187, 193 (2d Cir.1987), *cert. denied,* 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988) (expert opinions cannot involve "mere speculation or idiosyncratic opinion"); *Evers v. General Motors Corp.,* 770 F.2d 984, 986 (11th Cir.1985) (expert affidavits cannot be based on "conclusory allegations").

**69.** As discussed above, however, Plaintiff's own expert testified that urokinase production and marketing, even if on schedule, could occur as late as August 2000, when other intervening causes already occurred. *See* discussion above.

There is no evidence that Microbix planned to re-audit BioWhittaker prior to the FDA audit in August of 1998 and, if anything, there is evidence to the contrary.

Finally, even if Microbix planned another audit prior to August of 1998, conducted the audit, and found the deficiencies identified by FDA, there is no basis on which reliably to find that BioWhittaker would have changed its operations based on Microbix's suggestions.

In short, the record renders factually unsupportable [70] the statements of Plaintiff's expert that Microbix would have solved the FDA problem. Accordingly, the Court concludes that the evidence does not permit a reasonable fact finder to find that Plaintiff would have conducted an audit of BioWhittaker prior to the FDA audit, identified the deficiencies which the FDA identified, and corrected those deficiencies to the FDA's satisfaction.

Microbix argues that absent the exclusive agreement it would have stockpiled a three-year supply of cells by the time the Cali clinic closed, and that it would therefore have been able to move forward with the launch of its generic product notwithstanding the loss of the Colombian cell source. Pl's Opp. at 42 n. 30. This argument is speculative and contrary to evidence.

The record indicates that Microbix did not have the means or intention of stockpiling a three-year supply of HNK cells. Contemporaneous documents written by Microbix discussed only a six to twelve months supply of cells. Defs' Ex. 16 at MBX002336; Defs' Ex. 26 at MBX001074. Moreover, Speace (Gensia's Vice–President) testified that Gensia asked Microbix to purchase a three-year supply of cells but that Microbix never took the necessary steps to do so. Pl's Ex. 24 at 72–76. Finally, the Court granted Microbix the right to purchase an approximately three-year supply of cells from BioWhittaker, but Microbix failed to do so before the FDA banned further importation of the cells from the Cali clinic.

The Court concludes that Plaintiff has failed to come forward with evidence from which a reasonable fact finder could conclude that Microbix's injury, if any, was caused by the exclusive supply agreement. Accordingly, summary judgment with respect to the antitrust claims shall be granted.

### C. Interference With Economic Relationships

■ Plaintiff alleges that Abbott intentionally and maliciously interfered with the business relationship between Microbix and BioWhittaker. First Amended Compl. at ¶ 88. Under Maryland [71] law, this tort consists of four elements:

(1) intentional and wilful acts;

(2) calculated to cause damage to the plaintiff in its lawful business;

(3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and

(4) actual damage and loss resulting.

*Willner v. Silverman*, 109 Md. 341, 71 A. 962 (1909).

■ As Judge Harvey of this Court noted, the third element of the test relat-

---

**70.** *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.").

**71.** It appears that the parties agree that Maryland law governs this claim.

ing to malice "necessarily hinges on whether defendants' actions constitute a violation of federal or state antitrust laws." *Purity Products, Inc. v. Tropicana Products, Inc.,* 702 F.Supp. 564, 575 (D.Md.1988), *aff'd,* 887 F.2d 1081 (4th Cir.1989). For this reason, "a summary disposition in favor of the defendants [is] appropriate only in the absence of a demonstrable antitrust violation." *Faulkner Advertising Associates, Inc. v. Nissan Motor Corp. in U.S.A.,* 905 F.2d 769, 775 (4th Cir.1990) (quotation omitted). Therefore, under Maryland law, Plaintiff's interference claim "stands or falls along with its federal antitrust claims." *Id.*

In this case, although the record permits a reasonable fact finder to conclude that there exists a violation of antitrust laws (sections 1 and 2 of the Sherman Act), the interference claim has the same defects as those of the antitrust claims. Namely, the evidence concerning damages is speculative. Thus, element (4) of the interference with economic relationships claim would not be met. Because Plaintiff's antitrust claims are insufficient to withstand summary judgment, the Court shall grant summary judgment with respect to the interference with economic relationships claim.

## IV. *CONCLUSION*

For the foregoing reasons:

1. Defendants Abbott Laboratories', BioWhittaker, Inc.'s, and BioWhittaker Holdings, Inc.'s Motion for Summary Judgment is GRANTED.

   a. The First Cause of Action (section 1, Sherman Act), the Second Cause of Action (section 2, Sherman Act), and the Sixth Cause of Action (Interference With Economic Relationships) are DISMISSED WITH PREJUDICE.

   b. The pending claims against BioWhittaker—the Third Cause of Action (Misrepresentation), the Fourth Cause of Action (Promissory Estoppel), and the Fifth Cause of Action (Declaratory Relief)—are DISMISSED WITHOUT PREJUDICE and shall proceed in Civil Action No. 98–4094.

2. Judgment shall be entered by separate Order.